Argued October 10, 1975, reversed January 22, 1976

# In the Matter of Michael O'Neill, Alleged to be a Mentally Ill Person

## STATE OF OREGON, *Respondent,*

*v.*

## MICHAEL O'NEILL, *Petitioner.*

545 P2d 97

*Leslie M. Roberts,* Portland, argued the cause for petitioner. With her on the briefs were Kell, Alterman, Runstein & Thomas, Portland.

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for respondent. With him on the briefs were Lee Johnson, Attorney General, and Timothy Wood, Assistant Attorney General, Salem.

Before O'Connell, Chief Justice, and McAllister, Denecke, Tongue, Howell, and Bryson, Justices.

BRYSON, J.

## BRYSON, J.

The appellant (petitioner) was adjudicated a mentally ill person[1] and involuntarily committed to the State Mental Health Division for treatment. The Court of Appeals affirmed[2] and we granted the petition to review.

■ We review de novo.[3] Appellant was 28 years of age and prior to commitment lived in an apartment with a woman companion. At about 2 p.m. on October 27, 1974, an officer of the Portland Police Bureau was summoned to the home of Mrs. O'Neill, appellant's mother, because appellant "was acting up" and his mother was "afraid of him." Based on his observations, the officer transported appellant to the University of Oregon Medical School where he was admitted to the crisis unit.[4] The trial record shows that the police officer filed a "person report" with the circuit court for

---

[1] ORS 426.005:

"* * * * *.

"(2) 'Mentally ill person' means a person who, because of a mental disorder, is either:

"(a) Dangerous to himself or others; or

"(b) Unable to provide for his basic personal needs and is not receiving such care as is necessary for his health or safety.

"* * * * *."

[2] *State v. O'Neill,* 21 Or App 710, 536 P2d 552 (1975).

[3] See ORS 426.060(1) (commitments made by court having probate jurisdiction); ORS 111.205 (jurisdiction of probate courts in nature of suit in equity); *In re Fehl,* 159 Or 545, 551, 81 P2d 130 (1938) (commitment proceedings not actions at law). *See also State v. Nesbitt,* 23 Or App 202, 541 P2d 1055, 1060 (1975).

[4] ORS 426.215 provides:

"(1) Any peace officer may take into custody any person who he has reasonable cause to believe is dangerous to himself or to any other person and who he has reasonable cause to believe is in need of immediate care, custody or treatment for mental illness. * * *

"* * * * *.

"(3) The peace officer * * * shall notify forthwith a court having probate jurisdiction in the county * * * of the fact of taking the person into custody and the person's whereabouts. * * * [T]he judge shall immediately commence proceedings pursuant to ORS 426.070 to 426.130.

"* * * * *."

[ 61 ]

Multnomah County on October 28, 1974. On the same date a "Notice of Mental Illness" form was filed in the circuit court, stating:

"* * * * *.

"The undersigned, each being first duly sworn, says that: [Michael O'Neill] * * * is a mentally ill person * * * and is in need of treatment, care or custody.

<u>X  /s/ S. Paulson, M.D.</u>
<u>X  /s/ Michael P. Resnick, M.D.</u>

"WEDNESDAY, OCTOBER 30, 1974

"Subscribed and sworn to before me this <u>27</u> day of <u>October</u>, <u>1974.</u>

"* * * * *."

Again, on October 28, 1974, the court issued an "Order to Investigate" directing the Community Mental Health Director, or his designee, to determine whether there was probable cause to believe that appellant is in fact a mentally ill person.

An "Investigation Report and Recommendation" was also filed by Dr. Paulson as designee of the Community Mental Health Director, which stated in part:

"* * * * *.

"2. Pursuant to an order of the Court, on <u>October 27</u> [<u>28</u>], <u>1974</u>, I conducted an investigation to determine if there is probable cause to believe that the above-named person is, in fact, a mentally ill person.

"3. In my opinion there is probable cause to believe the person investigated is a mentally ill person. * * * Pt was brought in by Police because of threats of violence to his mother. * * *

"Pt is incoherent, agitated, and potentially violent.

"* * * * *.

<u>/s/ S. Paulson, M.D.</u>

"[Oath omitted]."

Appellant objected to the above investigation report being received in evidence and the court sustained the objection. ORS 426.095 provides:

"The allegedly mentally ill person shall have the right to cross-examine all witnesses, the person conduct-

ing the investigation, the examining physicians or other qualified persons recommended by the division who have examined the persons. *Neither the investigation report nor any part thereof shall be introduced in evidence without the express consent of the allegedly mentally ill person.*" (Emphasis added.)

A warrant of detention was issued pursuant to ORS 426.070(5), and the court issued an "Order for Citation" which stated he "concluded that there is probable cause to believe that MICHAEL O'NEILL is a mentally ill person."

On October 30, 1974, the court conducted a hearing in chambers. The testimony shows that appellant was fully advised of his rights pursuant to ORS 426.100, including his right to counsel and his right to postponement. Appellant was represented at the hearing by attorney Blank from the Metropolitan Public Defender.

The appellant was questioned and observed by two court appointed examiners, A. Ben King, M.D., and Charles Fosterling, MSW (social worker with Master degree), who filed their respective verified reports[5]

---

[5] Mr. Fosterling reported the following:

"* * * * *.

"MENTAL AND EMOTIONAL STATUS:

"Loose thought association. Moves from subject to subject. Agitated. Inappropriate effect.

"PHYSICAL CONDITION:

"Neatly dressed young man anxious physically. Nervous and verbal. Acting excitable.

"FINDING: * * * mentally ill person. Question his ability to make valid judgments for his day to day care.

"* * * * *."

Dr. King reported the following:

"* * * * *.

"MENTAL AND EMOTIONAL STATUS:

"Very nervous and anxious—talks rapidly—interrupts judge in opening remarks.

"Tangential, Circumferential, Loose associations, Paranoid and delusioned re medications and his ability to treat himself. Inappropriate laughter at times.

"PHYSICAL CONDITION:

"Good

"FINDING: * * * mentally ill person * * *.'

"* * * * *."

[ 63 ]

with the court. Both examiners recommended commitment. At the conclusion of the brief hearing, appellant's attorney stated:

"* * * I think the record does reflect that there would be evidence of mental disorder in this case but I do not believe there is any evidence that Mr. O'Neill is dangerous to himself or another, or is not receiving his basic needs. Statutorily, under the new law, I don't believe he can be committed."

The court concluded:

"THE COURT: * * * We are going to have to get some care and treatment for you [Mr. O'Neill].

"* * * * *.

"THE COURT: So you will be committed to the State Division of Mental Health."

A threshold question is appellant's contention that the Oregon commitment statutes, and particularly ORS 426.005, are unconstitutional under the Ninth and Fourteenth Amendments to the United States Constitution and the recent case of *O'Connor v. Donaldson,* 422 US 563, 95 S Ct 2486, 45 L Ed 2d 396 (1975), which was decided after the Court of Appeals handed down its opinion in this case.[6]

On this issue the Court of Appeals based its opinion

[6] Recent cases and articles have articulated on the boundaries of the state's power to act. *See, e.g.,* In re Ballay, 482 F2d 648 (DC Cir 1973); Kendall v. True, 391 F Supp 413 (WD Ky 1975); Lessard v. Schmidt, 349 F Supp 1078 (ED Wis 1972); Commonwealth ex rel Finken v. Roop, ——Pa Super——, 339 A2d 764 (1975); In re Levias, 83 Wash 2d 253, 517 P2d 588 (1973); State ex rel Hawkes v. Lazaro, ——W Va——, 202 SE2d 109 (1973); American Bar Foundation, The Mentally Disabled and the Law (rev ed 1971); R. Benton, *Criteria in Civil Commitment Proceedings,* 26 U Miami L Rev 659 (1972); D. Chambers, *Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives,* 70 Mich L Rev 1107 (1972); A. Dershowitz, *Preventive Confinement: A Suggested Framework for Constitutional Analysis,* 51 Tex L Rev 1277 (1973); *Developments in the Law,* 87 Harv L Rev 1190 (1974); A. Elliot, *Procedures for Involuntary Commitment on the Basis of Alleged Mental Illness,* 42 U Colo L Rev 231 (1970); J. Hardisty, *Mental Illness: A Legal Fiction,* 48 Wash L Rev 735 (1973); J. Levermore et al, *On the Justifications for Civil Commitment,* 117 U Pa L Rev 75 (1968); R. Postel, *Civil Commitment: A Functional Analysis,* 38 Brooklyn L Rev 1 (1971); Symposium, 62 Cal L Rev 671 (1974); Symposium, 23 Cath L Rev 643 (1974); Symposium, 13 Santa Clara Law 367 (1973); Comment, Mental Illness: A Suspect Classification? 83 Yale L J 1237 (1974).

on *State v. Gardner,* 16 Or App 464, 518 P2d 1341, S Ct review denied, *cert. denied* 419 US 998, 95 S Ct 313, 42 L Ed 2d 272 (1974), and declined appellant's contention in this respect because the constitutional question was not raised in the trial court. In *The Alpha Corp. v. Multnomah Co.,* 182 Or 671, 680, 189 P2d 988 (1948), the court held:

> "* * * The constitutional question was not raised in the lower court, and for that reason we can give it no consideration. It is the general rule that an appellate court will not consider grounds of defense not raised in the lower court. This rule includes the question of the constitutionality of a statute (*except, perhaps, in cases involving deprivation of life or liberty*). * * *" (Emphasis added.)

In *Highway Com. v. Helliwell,* 225 Or 588, 591, 358 P2d 719 (1961), we observed:

> "* * * As Mr. Justice Rossman observed in a specially concurring opinion in *Senger v. Vancouver-Portland Bus Co.,* supra, 209 Or at 47, the rule against considering a constitutional question for the first time on appeal is not inflexible, but the record from the trial court must afford some basis for a finding that a challenged act invades some constitutional right. * * *"

■ We believe the better rule, in cases involving an individual's liberty or freedom from involuntary confinement, should be one of flexibility. And if the trial court record is complete, as here, and sufficient to support a finding on a constitutional right, we should consider the constitutional issue in the case when raised for the first time at the appellate level. This is particularly so in mental commitment cases where the statutory scheme necessarily involves urgency in order to give medical treatment to the individual and to remove the element of danger to himself or others.

■ However, we conclude that the Oregon commitment statutes, and particularly ORS 426.005, when viewed restrictively, that is, "Dangerous to himself or others; or [u]nable to provide for his basic personal needs and is not receiving such care as is necessary for his health

[ 65 ]

or safety," does not infringe on the constitutional rights of an individual. The state has an interest and duty to protect the lives of its citizens when in danger and, as stated in *O'Connor v. Donaldson, supra,* "* * * the State has a proper interest in providing care and assistance to the unfortunate * * *." 45 L Ed 2d at 407. *O'Connor* generally supports the purpose evidenced in the Oregon statutes of involuntarily committing an individual who is dangerous or not capable of surviving safely in freedom by himself or without help of other willing persons. *Id.* at 407.

The mental commitment statutes of other states have recently been held unconstitutionally vague where the statutes merely require a certification by two physicians that the individual is in need of observation and treatment or that the subject's illness renders him "in need of care." *See Kendall v. True,* 391 F Supp 413, 418 (WD Ky 1975); *Commonwealth ex rel Finken v. Roop,* — Pa Super ——, 339 A2d 764, 778-79 (1975). However, our reading of those cases would indicate that the statutes there involved were similar to the Oregon statutory requirements prior to the amendments adopted in 1973.[7]

We conclude that the Oregon commitment statutes, and particularly ORS 426.005, when strictly construed as herein set forth, are not unconstitutional on the ground of vagueness or as an invasion of privacy as protected by the Ninth and Fourteenth Amendments to the United States Constitution. The state, when acting strictly as provided in ORS Chapter 426, may legitimately intrude on the privacy of an unfortunate individual if he is a "mentally ill person" as defined in ORS 426.005.

Appellant's principal assignment of error is that both the trial court and the Court of Appeals erred in finding there was sufficient evidence that appellant was a mentally ill person beyond a reasonable doubt

---

[7] 1975 Oregon Laws, ch 690, made further amendments to the Oregon commitment statutes but are not involved herein.

(ORS 426.130) and subject to involuntary commitment. *O'Connor* holds:

> "A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that the term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily *if they are dangerous to no one and can live safely in freedom.*

> "May the State confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community? That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution. Moreover, while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends. * * *" 45 L Ed 2d at 407. (Emphasis added.)

This is not contrary to the Oregon statutory provision.

■ From our review of the testimony, we find that there is no substantial evidence to prove that appellant fits the statutory definition for mental illness, beyond a reasonable doubt. There is no direct evidence that appellant was dangerous to himself or others. Appellant's mother testified at the hearing that she had heard of fights but she gave no testimony that she had any personal knowledge regarding fights. She testified:

> "Q Were these things burdensome, frightening, or what?
> "A At times.
> "Q Could you describe them?
> "A Disrespectful things I don't believe he would do if
>
> "Q I don't understand what these are.
> "A Well, there have been many fights through the

past, and this woman he has been staying with said it was getting terrific out there where he lives, fighting. * * *.

"THE COURT: You tell us what you have seen, not what other people have told you. * * *.

"* * * * *.

"MR. BLANK: We would object to testimony about fights that she hasn't witnessed."

On cross-examination appellant's mother testified:

"Q * * * Mrs. O'Neill, within the last six months has Michael struck you physically?

"A No.

"Q Have you seen him strike anybody else?

"A No.

"Q Have you within the last six months seen him inflict any injury upon himself in any manner such as slitting his wrists or anything like that?

"A No.

"* * * * *.

"Q Why did you call the police on October 27?

"A Because I knew and I have known each time I saw him he was more ill, and I knew he had to get to the hospital, and I knew that was the quickest way to get him there."

There is no evidence that appellant at the time of the hearing was suffering from malnutrition or inability to care for his basic personal needs. From the reports in the trial court file, it would appear that he was neat, clean, and properly groomed. The state could have called the woman with whom he was living or someone who witnessed the alleged fights but no such evidence was offered to the court. The only witnesses called were the two examining experts and appellant's mother. In fact, the two experts offered no testimony on the record but proceeded to conduct the hearing and questioned the appellant and his mother.[8] As previously noted, their written reports of their findings are part of the trial court file but they are actually quite meager. The present Oregon commitment statutes, as

[8] In 1975 House Bill 2378 was introduced to require the District Attorney to assist the court in these proceedings. The bill did not pass.

well as *O'Connor v. Donaldson, supra,* require more than shown by the testimony elicited in this case.

> "The new commitment standard, with its more objective criteria for determining who is a 'mentally ill person,' should reduce the examining experts' domination of commitment hearings and make it possible for attorneys and judges to play a more meaningful role. The determination whether a person is sufficiently 'dangerous' or 'unable to meet his basic personal needs' to justify commitment is not a decision resting exclusively upon the expertise of the court-appointed examiners. The commitment decision under the new standard ultimately must be a legal judgment by a court rather than a medical diagnosis by examining experts." L. Kirkpatrick, *Oregon's New Mental Commitment Statute: The Expanded Responsibilities of Courts and Counsel,* 53 Or L Rev 245, 257 (1974).

The more restrictive standards for commitment were established in ORS chapter 426 by the 1973 legislature.[9] Although there was evidence of mental disorder, we do not find beyond a reasonable doubt that appellant was dangerous to himself or others or unable to provide for his basic personal needs, or that he was not receiving such care as was necessary for his health or safety. A trial court may well feel that treatment is in the best interest of the individual involved, but the legislature chose to make voluntary commitment the rule in those cases. There must be evidence proving beyond a reasonable doubt that the individual is men-

---

[9] "This entire bill is designed to encourage voluntary treatment within the community in preference to state hospitalization after commitment. Commitment is considered to be appropriate only for individuals who, because of mental illness, are dangerous to themselves or others or are unable to provide for their basic personal needs and are not receiving such care as is necessary for their health or safety. Inclusion of the latter concept allows commitment of some persons, primarily the elderly and those with chronic psychoses or organic brain disease, who are disoriented, out of contact with reality, or unable to make decisions about their basic needs because of their mental condition. It does not include the mentally retarded or persons who are unable to care for their basic needs but are being properly cared for by others." (Letter of J. D. Bray, M. D., to the Honorable Elizabeth W. Browne, Chairman, Senate Committee on Judiciary. Exhibit A to Senate Judiciary Committee Hearings on Senate Bill 510, pp. 1-2, April 4, 1973.)

tally ill as defined in ORS 426.005(2). We have no alternative but to reverse.

The appellant also assigns as error the admission in evidence of a prior case file (appellant had been committed to Dammasch Hospital in 1965).

The court stated that he had before him court file No. 33126 "In the Circuit Court of the State of Oregon for Multnomah County, In the Matter of Michael O'Neill, alleged to be a mentally ill person," and that he would "take judicial notice of the contents of its own file unless there is some objection to its doing so."

"MR. BLANK: I would object to the file No. 33126 being placed in evidence for the reason that it appears there was no representation by counsel at the prior hearing, and also that much of the material in the file is hearsay."

The court overruled the objection and received the file in evidence. We can understand that a trial court is interested in obtaining all of the information possible in reaching a decision as to whether an individual should or should not be involuntarily committed. The recent case of *State ex rel Juv. Dept. v. Martin,* 271 Or 603, 533 P2d 780 (1975), involved a proceeding for termination of parental rights where the trial court received into evidence files on three commitment proceedings against the child's father. Admission of those files was held to be error, and we stated:

"It is well established in Oregon that a court cannot properly take judicial notice of files in a different case than the case before it. [Citation omitted.]"

It may be argued that two distinct commitment proceedings against the same individual constitute the "same" case, but we do not believe that would be correct. The issue in this case was the mental condition of the appellant at two widely different points of time (almost 10 years).

The appellant also contends certain hospital records

maintained while he was detained at the University of Oregon Medical School prior to hearing were improperly received into evidence.

Appellant's attorney objected to the receipt of the medical records as follows:

"I object to the medical records on the case of *Miranda v. Arizona,* and patient-doctor privilege grounds."

The court overruled the objection and received the medical records, which consist primarily of statements made by the appellant and observations of him while he was detained at the University of Oregon Medical School. They also contained notations by a physician.

This is not a case of criminal prosecution where statements received without warning of constitutional rights are to be used for conviction of a criminal. Here the custodial interrogation is not designed to elicit "incriminating information." As provided by statute, it is to determine what urgent medical treatment is necessary for the individual.

In *People v. Fuller,* 24 NY2d 292, 248 NE2d 17, 300 NYS2d 102 (1969), the court held:

"These medical examinations, however, are used solely for diagnostic purposes. Any admission made to the doctor may not be received in evidence at the trial on the criminal charges. * * * As the program is intended solely for the addict's benefit, self incrimination becomes irrelevant. * * * It is the nonincriminating purpose of the examination that makes the privilege against self incrimination and the right to counsel inoperative at the physical examination." 300 NYS at 107.

In *State ex rel Finken v. Roop, supra* at 775, the court held that *Miranda* type warnings need not be given although an individual does have the right to remain silent.

"The exercise of the right to remain silent in civil commitment would prevent the state from conducting the psychiatric interview and most psychiatric testing. If the state were thereby rendered unable to meet its bur-

den of proof, the state's ultimate interests in commitment—the confinement of dangerous persons and the care of persons unable to care for themselves—would be substantially impaired. The costs to the state seem to outweigh the need for protection of the individual's interest in privacy, and protection of privacy is the primary function of the privilege in the commitment process. *Lessard* would thus appear to be erroneous in holding that due process requires that an individual be accorded the right to remain silent." 87 Harv L Rev at 1312.

■ This is not a criminal proceeding and the *Miranda* warnings, if required, could effectively frustrate the finding of mental health or illness, and such warnings are not required in a civil commitment for mental illness.

■ Appellant also objected on the ground that the receipt of the records into evidence violated the doctor-patient privilege. The Court of Appeals holding that appellant was held for observation and not treatment appears to be incorrect. He was taken to the crisis unit for medical help and the records show his progress and the treatment and medication given him.

In an analogous situation, we recently held, in *State ex rel Juv. Dept. v. Martin, supra,*
"* * * Although a proceeding to terminate parental rights under ORS 419.525 may be sui generis for some purposes, as held by the Court of Appeals, we believe that for purposes of evidence it is essentially a 'civil proceeding,' so as to be subject to the provisions for physician-patient privilege, as set forth in ORS 444.040(1)(d), * * *." 271 Or at 605.

Similarly, this commitment proceeding is a civil proceeding. Wigmore, while generally critical of the physician-patient privilege, notes that "[t]he privilege is universally agreed to include the physicians' entries in medical records of a *hospital.* * * *" 8 Wigmore on Evidence 839, § 2382 (McNaughton rev 1961). (Emphasis theirs.)

ORS 426.215(5) provides:
"* * * * *.

"(5) Persons hospitalized under this section shall receive the care, custody and treatment required for their mental and physical health and safety, and the treating physician shall report such care, custody and treatment to the court as required in ORS 426.075. * * *.

"* * * * *."

ORS 426.075 provides:

"The court shall be fully advised * * * by the treating physician of all drugs and other treatment known to have been administered to the allegedly mentally ill person which may substantially affect his ability to prepare for or function effectively at the hearing."

Since ORS 426.075 specifically states what information the judge shall receive, we are of the opinion that the disclosure as made in this case is improper and that the doctor-patient privilege applies in the instant case except as modified by ORS 426.075.

Reversed.