In the Matter of Janet Carol Heintz, alleged to be a
Mentally Ill Person.
STATE OF OREGON, *Respondent,*
*v.*
JANET CAROL HEINTZ, *Appellant.*
(No. 828, CA 6349)
554 P2d 556

*Robert F. Riede,* Portland, argued the cause and filed the brief for appellant.

*Karen H. Green,* Certified Law Student, Salem, argued the cause for respondent. With her on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Tanzer, Judge, and Sloan, Senior Judge.

SLOAN, S. J.

**SLOAN, S. J.**

This is an appeal from a determination that appellant is a mentally ill person. The basic assignment of error is the lack of sufficient evidence to justify the finding of mental illness.

The court did not find appellant to be dangerous to herself or others, ORS 426.005(2)(a). The court did find that she was unable to provide for her basic needs and is not receiving such care as is necessary for her health and safety. ORS 426.005(2)(b).

The evidence consisted of the testimony of appellant's mother who, with her husband, had executed the affidavit which initiated these proceedings, and an examining physician and a nonmedical examiner. The latter's qualifications are not disclosed. ORS 426.110. There was some limited testimony by appellant's teenage son.

The substance of testimony which could be interpreted as indicating dangerousness is found in the following testimony of appellant's mother:

"Well, she's made threats to her husband who she is no longer living with, they're separated. She's inquired how she could find a gun. She called me on the telephone and said that if I did not do something to help her I would have a dead daughter, which I would indicate in my thinking she was thinking perhaps of suicide."

The mother also testified that on one occasion appellant had twisted her own teenage daughter's arm. Appellant's explanation of the desire for a gun was that she liked to hunt and engage in target practice. She believably stated that she considered herself a good hunter and marksman. She claimed she had grabbed her daughter's arm, not twisted it. Appellant and her husband apparently engaged in frequent aggravating conduct. Neither examiner found her to be dangerous. We agree with the lower court that the element of dangerousness was not proven beyond a reasonable doubt.

The evidence in regard to appellant's ability to care for herself can be summarized as follows: The hearing took place on May 3, 1976. There was evidence that appellant had worked as a supervisor of medical records at a clinic of some unidentified kind until the previous February 17. She had quit her job because of tensions created by her husband. Appellant had been unemployed since February and, presumably, had no income. A dissolution proceeding was pending at the time of this hearing. There was independent evidence in support of appellant's statements that her husband made threats of violence. Appellant was seeking unemployment benefits but was receiving none at the date of the hearing. She did not want welfare.

The evidence about appellant's living conditions and appellant's personal care for herself came from the mother. The mother testified that she had been gone during the "winter months." Upon her return home she became concerned about appellant's financial condition because appellant was unemployed; that appellant had discontinued taking prescribed medication; that appellant had difficulty in obtaining food; and that appellant's apartment was disorderly. It appeared from the mother's testimony that the lack of sufficient food and the use of a bathtub for washing clothes was caused by lack of money, not because appellant was incapable of caring for herself. The mother testified that appellant selected her own clothing, dressed and groomed herself and could have driven her own car to the hearing.

When the examining physician was asked why he had concluded that appellant could not care for herself, he responded:

"The factor that she states she has no finances to provide such, the factor that she would not have had food for the last three or four days if her mother had not provided it. The factor that she has unpaid bills. The factor that she's made no adequate plan for her financial status, the factor that she quit her job and hasn't in the last, let's see, ten weeks, except for a gesture of applying

for unemployment a week ago, has made no provision for the future.

"The factor that she has governed and discontinued medications without medical advice and that she states she has physical problems which need care but is absolutely non specific as far as these are concerned and I take it to mean, and she did say, she just needed a physical exam but had no specific complaints why she needed it other than her dental condition."

Appellant had testified that she had discontinued the mentioned medication because the combination of the medicine and the tensions created by her husband gave her ill effects that she disliked. She also testified that she did not want to go on welfare and was seeking unemployment benefits instead. This may not have been a correct choice but it is a legitimate one.

The examiners acknowledged that, from their observations, there was no indication of malnutrition, ill health, poor dress or other outward indication of poor care. Her response to the questions put to her by the examiners demonstrated no lack of alertness or understanding.

As indicated, appellant wanted to avoid receiving welfare benefits. Appellant was not asked if she would then cooperate in a volunteer program of any kind.

The record in this case provides the same reasons for reversal as that found in *State v. O'Neill,* 274 Or 59, 545 P2d 97 (1976). The statement in the *O'Neill* case that the present statute "as well as *O'Connor v. Donaldson,* [422 US 563, 95 S Ct 2486, 45 L Ed 2d 396 (1975)], require more than shown by the testimony elicited in this case" (274 Or at 68-69) is appropriate to the instant case.

Reversed and remanded.

**TANZER, J.,** specially concurring.

I concur with the reasoning of the majority. The standard of proof beyond reasonable doubt, borrowed

from criminal procedure, is inappropriate in a mental hearing where the issue is the degree of probability of future possibilities rather than the existence of a past fact. Yet the legislature has directed that we apply that standard and, however difficult it may be to apply, we are bound to and will find ways to make it workable.

I also concur with the majority's result, on this record. I disagree only in that I am not persuaded that the facts could not constitute proof beyond reasonable doubt of mental illness if they were properly interpreted in light of psychological or psychiatric knowledge. The facts are in the record and the conclusions of the experts are in the record. The missing element is the rational nexus between facts and the required statutory conclusions. We require that link in administrative hearings, *Home Plate, Inc. v. OLCC,* 20 Or App 188, 530 P2d 862 (1975); it is no less appropriate in a judicial setting where the legislature has required great caution.

There are ample facts which indicate that the failure of this hearing may be procedural rather than substantive. For example, appellant's discontinuation of her program of outpatient medication may have effects which are relevant on the issue of danger or ability to care for herself, but we are not informed of them. She explained her reason for discontinuation:

"Q.   [by the court] What was the Stelazine doing for you?
"A.   The Stelazine, at that time prior to this, was producing colour changes in the brain because of the pressure from Rudolph Heintz and I sensed that I should come off of Stelazine, at least, the dosages that I was on at that time.

"Q.   You say colour changes in the brain, I don't—I'm not familiar with that description?
"A.   To me it was a case of pre-glaucoma.

"Q.   Keep going.
"A.   And had I—to me if I had continued on the

dosage that I was on at that time I would have been in jeopardy of being blind.

"Q. Why do you say that?

"A. Because I could see when I looked outdoors, for instance, I could see reds and greens and then when I—how would I put it—distortions of reds and greens and then when I rested I was not able to get adequate rest and this to me was a pressure change in the brain.

"Q. (By Doctor Hall) Did you consult a physician concerning this?

"A. Concerning this particular symptom?

"Q. Yes.

"A. Yes, I did. But—I, let's see—I did not indicate those changes at that time because at that time Rudolph became very violent and beat me up against a counter in a bathroom and I suffered a cracked or bruised rib and a hematoma. And that was the culmination of a previous years' violence and the beginning of the next two years violence.

"Q. So, you made this decision on your own, you did not have a physicians' advise about the colour changes?

"A. No."

Her explanation gives cause to a lay judge for alarm and may be significantly symptomatic of some pathology, but there is no explanation allowing us to relate it to the ultimate statutory issue of danger to self or others. The same may be said of several other matters which were brought out during her examination and that of her family members. It is the lack of such an explanation, rather than a paucity of factual raw material, that makes this record deficient below and on trial de novo.

The judgment must be that of the court. It cannot be delegated to the expert examiners, however reliant upon their expertise the courts must be. To assure that the determination remains judicial, it is necessary that the record contain, probably but not necessarily in the form of expert testimony, an exposition of the relationship of the facts arising from testimony and observations to a conclusion of mental illness, as statutorily, not medically, defined. That is not imposs-

ible or even cumbersome. It does not require a detailed diagnosis. It would require only that a witness explain why the facts indicate danger or helplessness. Then the trial court can justify a decision; then we can perform our statutory obligation of trial de novo.

This requirement is consistent with my understanding of the reasoning of the majority, with which I concur. I stress its significance because I would reverse and remand on this sole ground.