Argued June 23, affirmed October 30, 1978

In the Matter of John Troupe, Alleged to be a
Mentally Ill Person.
STATE OF OREGON, *Respondent,*
*v.*
JOHN TROUPE, *Appellant.*
(No. 44867, CA 10337)
586 P2d 95

Marc D. Blackman, Portland, argued the cause and filed the brief for appellant.

Melinda L. Bruce, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Johnson, Gillette and Roberts, Judges.

ROBERTS, J.

**ROBERTS, J.**

Appellant seeks reversal of an order of civil commitment by the circuit court which found him mentally ill beyond a reasonable doubt pursuant to ORS 426.005(2)(a) and (b).[1]

Appellant is a 24-year-old veteran of the armed services who was a full-time student at Butte College in Chico, California, at the time of his arrest. He had come to Portland, Oregon, to visit with his father whom he had not seen since his parents were divorced 12 years earlier. Appellant arrived with a friend in the early morning hours of Saturday, January 14, 1978, planning to stay only for the weekend. Later that morning he met a young woman who offered to show him the Portland State University campus where she was a student, and appellant was considering transferring. Appellant's father testified that his son was in and out of the house throughout the weekend.

Although appellant planned to return to California on Monday afternoon, he instead dropped his friend off to hitchhike back to Chico, and returned to his father's home at about 3 p.m. Prior to his arrest, appellant was last seen by his father on Wednesday, January 18, 1978. On that date appellant went to a car lot in Portland where he requested permission from a salesperson to test drive a Corvette. When told that his jacket was not sufficient security to take the car off the lot, he hastily left the lot office and ran and jumped around the locked Corvette. He returned and argued with the salesperson and told the owner of the lot who was also present that he would be back. He returned a few minutes later in a car and presented the keys as a "deposit" on the Corvette. His request to drive the vehicle was repeatedly refused. Appellant

---

[1] ORS 426.005(2)(a) and (b) provides:

"(2) 'Mentally ill person' means a person who, because of a mental disorder, is either:

"(a) Dangerous to himself or others; or

"(b) Unable to provide for his basic personal needs and is not receiving such care as is necessary for his health or safety."

returned a few more times, on each occasion acting as if he were present at the lot for the first time. The salesperson testified:

> "* * * [A]fter he went out and looked at the car again and came back in, he said, 'I was here yesterday. I have enrolled in the mechanics school now and I would like to buy the car.' Then, when he came in a few minutes later, he said, 'I could have got a good deal on this car yesterday. I would like to have it today. Here are my car keys for the down payment.'"

The salesperson subsequently attempted to return the keys to appellant, but the two became involved in a verbal dispute. Appellant assumed the posture of a boxer, then relaxed his fists, and then suddenly punched the salesperson in the face. The resultant wound required 12 stitches inside and two outside the victim's mouth.

The police arrived as the salesman was chasing appellant and appellant was taken into custody. In the police car appellant rambled in his conversation and was not understood by the officer talking with him. Appellant also had difficulty giving and spelling his name, and told the officer that his dog lived with two girls when he was asked for an address. Appellant was taken to the emergency room at the University Hospital North. The officer left appellant at the hospital at approximately 4 p.m. Later that same evening he saw appellant driving a taxicab at a high speed southbound on Interstate Highway 5. The officer attempted to overtake him and was joined in the high speed chase by several other police cars after appellant ignored orders to pull over and stop. The arresting officer's car was rammed from behind by appellant's car several times as appellant attempted to elude the pursing police vehicles. Appellant then tried to force the officer's car toward the right side of the road and into a tractor-trailer truck. The police finally succeeded in stopping appellant and returned him to the hospital. Appellant told the officer that he left the hospital

[ 878 ]

because "they" wanted to kill him. One of the officers filed the notification of mental illness.

Appellant raises three assignments of error: first, that there was not sufficient evidence to support the trial court's finding that appellant was a mentally ill person dangerous to others; second, that the expert examiners did not base their conclusions on a proper understanding of "beyond a reasonable doubt;" third, that the trial court did not sufficiently instruct the examiners on the weight to be given appellant's assertion of his privilege against self-incrimination. It is appropriate to consider these in reverse order.

■ At the hearing appellant invoked his Fifth Amendment privilege numerous times thus hindering the psychiatrist and the mental health professional in their questioning. The record shows that appellant objected to questions regarding the incidents of a criminal nature which occurred on January 18, 1978. Although the examiners expressed frustration that their examination could not extend into appellant's intent or his interpretation of the events, after the court explained the reason for sustaining the objections, the examiners refrained from asking these questions and one even asked appellant's attorney to inform him when his questions "crossed over the line." It is clear the examiners were instructed by the court on appellant's Fifth Amendment privilege and that they not only understood it but respected it. We find no error.

We do not consider the second assignment of error as we determine in this de novo review whether the reasonable doubt test has been met. *State v. O'Neill,* 274 Or 59, 545 P2d 97 (1976).

■ The most troublesome issue as we have stated in numerous cases, is whether there was sufficient evidence to support the trial court's finding that beyond a

[ 879 ]

reasonable doubt[2] appellant was a mentally ill person dangerous to others.

This court set out the difficulties of finding a person mentally ill beyond a reasonable doubt in *State v. Alexander,* 26 Or App 943, 554 P2d 524 (1976), and *State v. Heintz,* 26 Or App 935, 554 P2d 556 (1976) (specially concurring opinion). In reversing a commitment in *Alexander,* we said:

"It is difficult enough, as in the criminal cases, to identify when the proof of an alleged past act can be said to reach a level of beyond a reasonable doubt. It is, and will be, doubly difficult in the mental illness cases because of the necessity of predicting future conduct. And, in most cases, there will be no overt act involved that may persuasively indicate the likelihood of repetition. Based upon the cases that have thus far reached this court, what will be offered is testimony by lay witnesses of an individual's past conduct coupled with an interpretation of that conduct and of their observations by the professional examiners (ORS 426.110 and 426.120) and a prediction of not only his future conduct but also the effects which that conduct will have on himself and on those around him. It is not an overstatement to say that such a prediction will rarely, if ever, be completely free from doubt. Psychopathological predictions are simply not, as yet, that exact. (Citations omitted.)

"This is not to say that proof beyond a reasonable doubt is impossible in a civil commitment proceeding. The 1973 amendments altering commitment procedures were designed to enhance procedural safeguards in civil commitment hearings; they certainly were not designed to eliminate completely all civil commitments." *State v. Alexander, supra,* 26 Or App at 945-46.

These general comments in *Alexander* are clear.

---

[2] ORS 426.130 provides in pertinent part:

"After hearing all of the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If in the opinion of the court the person is not mentally ill, he shall be discharged forthwith. If in the opinion of the court the person is mentally ill *beyond a reasonable doubt,* the court may order as follows:" (Emphasis supplied.)

However, when we turned to the evidence before us, we added:

"Even though psychopathological prediction is far from an exact science, it is the only professional guidance available. Obviously, the statute contemplates that the professional examiners' findings will be an essential, but not a conclusive, basis for a finding that mental illness does or does not exist. *What is needed, then, is for the professional examiners to fully explain the facts and observations that led them to a conclusion. A statement by the examining doctors, as in the instant case for example, that the person has a 'flat' appearance is meaningless without explanation. And, if the examiner merely states a conclusion that the person being tested is dangerous to himself or others, it is not adequate. The basis of that conclusion must be supported by facts supporting the conclusion.*

"* * * * *

"* * * For emphasis we repeat that far more than these efforts are needed to apprise the court of the existence of mental illness. The examiners *must detail the basis for their findings.* It is again emphasized that *it is not enough to say that an individual is probably schizophrenic. In addition, the reasons for that judgment must be supplied.* Further, the actual and possible effects of the mental illness should be catalogued, with specific reference to the individual at hand." (Emphasis supplied.) 26 Or App at 947-48.

The degree of specificity this court was insisting upon was further spelled out in the concurring opinion in *State v. Heintz* (decided the same day as *Alexander*):

"* * * I disagree [with the majority opinion] only in that I am not persuaded that the facts could not constitute proof beyond a reasonable doubt of mental illness if they were properly interpreted in light of psychological or psychiatric knowledge. The facts are in the record and the conclusions of the experts are in the record. *The missing element is the rational nexus between facts and the required statutory conclusions. We require that link in administrative hearings * * *;* it is no less

[ 881 ]

appropriate in a judicial setting where the legislature has required great caution. (Citation omitted.)

"* * * * *

"The judgment must be that of the court. It cannot be delegated to the expert examiners, however reliant upon their expertise the courts must be. To assure that the determination remains judicial, *it is necessary that the record contain, probably but not necessarily in the form of expert testimony, an exposition of the relationship of the facts arising from testimony and observations to a conclusion of mental illness,* as statutorily, not medically, defined. That is not impossible or even cumbersome. It does not require a detailed diagnosis. *It would require only that a witness explain why the facts indicate the danger * * *.* (Emphasis supplied.) *State v. Heintz, supra,* 26 Or App at 940-42.

Neither *Alexander* nor the concurring opinion in *Heintz* states a rule of law, but each is merely an exposition of the standards we apply on de novo review to determine whether an individual is "a mentally ill person" beyond a reasonable doubt, as that term is defined in ORS 426.005(2). As the concurring opinion in *Heintz* stated, the essential requirement is 'that the record contain, probably but not necessarily in the form of expert testimony, an exposition of the relationship of the facts arising from testimony and observations to a conclusion of mental illness, as statutorily, not medically, defined.' 26 Or App at 941. Where it is necessary to rely on expert opinion to establish that nexus, then an explanation by the expert is necessary if his or her opinion is to be given persuasive weight. However, in this case, the nexus is apparent from the evidence as are the reasons for the expert's opinion.

In the present case, the evidence shows that appellant engaged in specific violent conduct which endangered others only 48 hours prior to the hearing. The examiners not only explained in their written reports that appellant was dangerous to others because of his mental illness, but they specifically identified the mental illness. They also were ques-

tioned by the court and appellant's attorney regarding the predictability of appellant's future conduct and both indicated that, based on the facts they had heard and their observations, appellant was mentally ill beyond a reasonable doubt and that he was dangerous to others.

Affirmed.

**GILLETTE, J.** concurring.

I concur in all that the majority says, but wish to add this note.

It is apparent to me that the trial judges who make commitment decisions are oftentimes influenced by the appearance or behavior of the person before them. That behavior may be unusual, even bizarre. However, in only the rarest instances does the judge describe this behavior for the record. The result, in a cold transcript, can be misleading. For example, a transcript may contain apparently reasonable responses to a psychiatrist's (or the court's) questions. Yet, if we knew that the person giving them did so while hiding beneath the counsel table, we would view the answers in a completely different light.

*De novo* review under a "beyond a reasonable doubt" standard is a difficult undertaking. We are greatly assisted when a trial judge narrates for the record what *happens* before him, as a supplement to what is *said.* I would urge trial judges to do so whenever appearance or behavior in court has a bearing on their judgment.