Argued September 5, reversed October 8, 1979

In the Matter of Thomas Barker alleged
to be a mentally ill person,
STATE OF OREGON,
*Respondent,*
*v.*
THOMAS BARKER,
*Appellant.*
(No. M-79-2-9, CA 13677)
600 P2d 958

John Mayfield, Oregon City, argued the cause and filed the brief for appellant.

James C. Rhodes, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Joseph, Presiding Judge, and Lee and Richardson, Judges.

JOSEPH, P.J.

**JOSEPH, P.J.**

Defendant appeals from an order committing him to the Mental Health Division pursuant to ORS 426.130(3). We review *de novo,*[1] and we reverse.

A petition for the involuntary commitment of the defendant was filed by one of defendant's neighbors and by his own father. Defendant was served with the citation at his home by police officers, and after locking his home he went with the officers to Dammasch Hospital. The testimony at the commitment hearing indicated that the petition for commitment was filed because of the collective belief by the signers of the petition, the neighbor's wife, the defendant's "wife" and others that defendant had a mental disease and was dangerous to himself or others.

Four events were testified about to establish defendant's dangerousness. The first was a fist fight involving a swing and a miss by defendant at the neighbor and a blow knocking defendant down administered by the neighbor, both of whom had been drinking. That event occurred at least two months prior to the hearing. The second was an incident when defendant, under the influence of alcohol, and in the course of an argument with the woman with whom he had lived for 10 years, fired shots from a handgun from inside their home through an open door and then feigned an attempt at suicide by firing a blank shell toward his own head. That occurred approximately three months prior to the hearing. The third event involved the defendant and his "wife," when she was staying with defendant's sister as a refuge against continual emotional turmoil in the home. Defendant appeared at the sister's home with a gun, but there is no record that any threats were made and defendant left peaceably. A fourth event occurred when defendant broke beer bottles and waved them around in the presence of his "wife." The record is not clear as to whether the incident was

---

[1] ORS 426.060(1); ORS 111.205; *State v. Nesbitt,* 23 Or App 202, 541 P2d 1055 (1975).

accompanied by verbal threats. The record suggests that the latter two incidents also occurred two or three months before the hearing.

None of the occurrences just recited was the one which precipitated the filing of the petition. That event was a phone call by defendant at about midnight to the neighbor, during which defendant stated that he had witnessed the neighbor and defendant's "wife" engaged in an act of sodomy. No threats were made by the defendant on the phone, no guns were involved, and when the neighbor denied the charge, defendant terminated the phone call. At the time of the call, defendant had previously voluntarily turned over all his firearms to his father. For an indefinite period of time there had been ongoing domestic turmoil in his relationship with his "wife" and those problems seem to be exacerbated when the defendant had been drinking. Defendant believed that his "wife" had for some time been having an affair with the neighbor and was no longer interested in defendant.[2]

Both of the examining physicians at the hearing found that the defendant had a mental disorder, but one concluded that he was not dangerous to himself or to others. The other doctor made an affirmative finding on that point. Both agreed that the defendant was not then able to provide for his basic personal needs and was not receiving the care necessary for his health or safety. One doctor recommended that defendant not be committed and that consideration be given to a voluntary treatment program as a patient at a local clinic or local psychiatric facility. That doctor diagnosed the defendant as "depressed and anxious," with a thought disorder related to alcohol abuse. The other doctor recommended hospitalization on a finding that defendant was suffering a "paranoid psychosis— characterized [by] paranoid jealousy delusion system."

---

[2] The foregoing statement of facts is substantially that contained in defendant's brief, which the state conceded "fairly describes most of [the] events."

The conflict between the examining physicians is made somewhat more sharp by their oral statements made at the close of the hearing. The doctor who recommended commitment said that he wished to supplement his written report with a statement "because I just couldn't write in a case as complex as this, where the data and evidence isn't as concrete as we would like it." He continued:

"I would feel more comfortable if I had the luxury of a prolonged psychiatric interview to perhaps clarify some of the pathological process and also the possible reasons for distortion in the various witnesses. However, I can say I feel very comfortable in making a diagnosis of the syndrome paranoid jealousy, sometimes called jealous paranoia. It's well recognized in the literature. Characteristically the affected patient develops a delusion, sometimes developing over a period of time, that his spouse is carrying on a sexual liaison or various sexual liaisons, either of the heterosexual or homosexual nature. This is well understood in the literature. It's also well understood that these people can be dangerous and are often likely to act upon the delusion.

"Based upon everything that I have heard today and using to a certain extent some of my clinical intuition, I feel very comfortable in making this diagnosis here. Therefore, even if we don't seem to have the information suggesting that Mr. Barker has tried to kill anybody, on the basis of the diagnosis that I have made, I believe that he is a potential and an imminently potential danger to other people. The fact that he has presented himself in a fairly coherent way today is not inconsistent with this diagnosis because paranoids frequently can pull themselves together in an interview, especially when it has to be an abbreviated interview. For this reason I feel comfortable in saying I believe he's a danger to others and possibly himself by virtue of a delusion and should be hospitalized for the immediate future."

The doctor who recommended against commitment said:

"You know, we have so much conflicting evidence, it seems to me, and a lot of difficulty in diagnosing

and I feel—and certainly a lot of difficulty in determining the extent, if any of his dangerousness, and that's the issue, it seems to me, that we are concerned with. I think that Mr. Barker has certainly been able to recognize some of the difficulties that he is facing and has recognized those to the extent of being able to be quite willing to in fact give up his firearms and to move away from situations that were potentially dangerous. So I think that at least his thinking is intact enough to preclude that dangerous activity at present and he seems to me to be moving in the direction of continuing that and wanting to get out of that situation that's potentially volatile and I think that's a good move and I don't think hospitalization would help him at present. At least, hospitalization here [at Dammasch State Hospital]. I would rather see him leave that [home] situation and move *** and seek outpatient treatment."

The trial court found beyond a reasonable doubt both that defendant was a mentally ill person and that he was "potentially dangerous to other people."

Before going to the matter which requires that the order of commitment be reversed, we note a peculiarity in the record relating to the proof of mental illness. The incident which caused the filing of the petition was the defendant's midnight call to the home of the neighbor and the accusation of sexual misconduct between the neighbor and defendant's "wife." It is apparent that at least one of the psychiatrists and the trial judge, as well as most or all of the witnesses, believed that the accusation was false and was based on a delusion. Both the neighbor and his wife testified at the hearing, and both said the accusation was false. However, both of them stated that the accusation was that the act had taken place in the downstairs of the house. The neighbor's wife testified that at the time when the act supposedly took place, her husband was asleep downstairs while the witness and the defendant's "wife" were upstairs in bed playing backgammon in a darkened room.

The odd quality of that version of events aside, the defendant testified that what he had observed occurred in an upstairs room and that he had been able to see it because he had climbed a ladder at the side of the house to look in the window after he had noted that his "wife" was in an upstairs room. The neighbor saw fit, toward the close of the hearing, to volunteer this information:

> "For what it's worth at this point, excuse me, but I do have a ladder of sorts built up on the side of my house and there are two by fours that are nailed directly to the side of my house. It's difficult at best to climb on them. Practically physically impossible to stand on them and look around the corner of my house and they have been on there for quite some time. I really distrust their ability to withstand the weight of a man."

Given this state of the record, it is certainly not absolutely clear that the defendant was in fact delusional. He may very well have seen what he said he saw—or, at least he may very well have believed, without delusion, that he saw what he said he saw.

We need not resolve the reasonable doubt issue with respect to the mental illness part of the commitment calculus. One of the psychiatrists did not believe the defendant was a danger to himself or others. The other examining physician, as noted above, believed "that he is a *potential* and an *imminently potential* danger to other people. \*\*\* I believe he's a danger to others and possibly himself by virtue of a delusion \*\*\*." In order to reach that conclusion the doctor had to identify the mental illness and make a prediction of immediate or imminent behavior. In *State v. Alexander,* 26 Or App 943, 947, 554 P2d 524 (1976), we said:

> "Even though psychopathological prediction is far from an exact science, it is the only professional guidance available. Obviously, the statute contemplates the professional examiners' findings will be an essential, but not a conclusive, basis for a finding that mental illness does or does not exist. What is needed then is for the professional examiners to fully

explain the facts and observations that led them to a conclusion. *** And, if the examiner merely states a conclusion that the person being tested is dangerous to himself or others, it is not adequate. The basis of that conclusion must be supported by facts supporting the conclusion."

Even if we assume that the defendant was in fact delusional, we must recognize that the delusion did not produce at the time it happened any violent or dangerous conduct. The midnight phone call may have been annoying or alarming, but even the recipients did not claim that there was any threat involved. At the time of the hearing the defendant's behavior was markedly nonviolent[3] and did not reveal any objective evidence of an existing thought pattern that would have led to a belief that the defendant would engage in conduct threatening to himself or others. Two or three months earlier he had conducted himself in ways that could fairly be regarded as threatening, but in connection with this incident no such thing happened. Instead, the examining physician predicted what might happen unless the defendant were committed for treatment. We do not believe that the statute as written permits a commitment on the basis of a medical prediction of future conduct without an evidentiary basis of facts or a more complete explanation of prognosticated behavior than was presented here to support it. *State v. O'Neill,* 274 Or 59, 69, 545 P2d 97 (1976); *State v. Alexander, supra; State v. Heintz,* 26 Or App 935, 554 P2d 556 (1976) (Tanzer, J., spec. concurring).

Reversed.

---

[3] He described himself as suffering from a "broken heart" as a result of his longtime companion's unwillingness to respond emotionally in ways he wanted and what he believed to be her unfaithfulness with the neighbor and others.