Argued and submitted September 20, 2005, reversed January 18, 2006

In the Matter of A. K.,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

A. K.,
*Appellant.*

0403-62768; A124272

126 P3d 754

Benjamin Haile argued the cause for appellant. With him on the brief was Patrick John Sweeney, P.C.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Wollheim and Rosenblum, Judges.

ROSENBLUM, J.

Haselton, P. J., concurring.

## ROSENBLUM, J.

The trial court adjudicated appellant to be a mentally ill person and committed her to the Mental Health Division after finding that because of a mental disorder she was unable to provide for her basic personal needs and was not receiving such care as is necessary for her health or safety. ORS 426.005(1)(d)(B). On appeal, she challenges the sufficiency of the evidence in support of the trial court's findings. We review *de novo*, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), and reverse.

We consider the facts as they existed at the time of the hearing. *State v. North*, 189 Or App 518, 520, 76 P3d 685 (2003). Appellant was placed on a hospital hold on March 4, 2004, after mental health outreach workers went to her house in response to a call that one of appellant's coworkers had made to a crisis hotline. Appellant was so preoccupied with her own thoughts that she was barely able to respond to the outreach workers; they had to knock repeatedly at the front door before she opened it and, even then, it took the workers, who eventually called the police for assistance, nearly an hour to convince her to unlock the screen door and let them into the house. When she did finally let them in, she had considerable difficulty responding to their questions, giving at most one-word answers. The house was very cold and appellant had not turned on the heat; she was wearing several winter coats and a stocking cap. Although there was food in the house, there was some concern that appellant had not been eating properly.

Appellant's commitment hearing took place one week after she was hospitalized. At the hearing, one of the outreach workers testified about the events and circumstances at appellant's house on March 4. Appellant's parents attended the hearing, evidently intending to testify, but they were not called as witnesses. Appellant was questioned by two psychologists, McCubbin and Beattie, whom the court had appointed as examiners. Appellant continued to appear preoccupied during the examination; she was slow to answer the examiners' questions, and her responses were barely audible. Nevertheless, she was able to respond appropriately to every question asked of her.

Appellant acknowledged that she suffers from bipolar disorder and stated that she had been taking lithium, which was prescribed to her by her primary care physician. She stated that the lithium helped her "get stabilized." Appellant made clear that she understood what her basic needs were and that she needed to attend to them. For example, when asked whether she knew what she needed to do if released, she stated, "I need to take care of myself," and indicated that she would go back to her home. Appellant reported that, before being hospitalized, she had been eating regularly and had, in fact, gone grocery shopping about a week earlier. Appellant described buying food such as carrots and celery, and she stated that the food in her refrigerator included soup and beans. Appellant did concede that, in her present condition, she needed help taking care of herself, but she indicated that her parents were willing to drive her to clinics so that she could obtain medical care.

From appellant's testimony, it appears that, in the months leading up to her hospitalization, her medication had lost its effectiveness. Appellant stated that she had experienced a "manic" episode "a couple of months" earlier and then had gone into a "crash," which she described as the worst she had ever suffered. When she later ran out of the medication, she did not get it refilled because she found it difficult to leave her house. She also did not communicate with her physician about her difficulty in getting the prescription refilled or about the fact that her illness seemed to be getting worse. Nor did she ask anyone else to help her.

At the hearing, appellant recognized that the right medication would improve her condition. The examining psychologists agreed with that assessment. McCubbin stated, "I believe the right medication is very important, and when you get there, I think you'll change a lot." Nevertheless, the examiners concluded that appellant's condition at the time was so debilitating that she could not act on her insights and thus would not obtain the necessary treatment. Beattie stated:

"[Appellant] does understand that a person needs to eat and keep heat in the house when the weather is cold and fill her prescriptions, but her level of depression is so severe at

this point and so debilitating, that I really don't think she will be able to do those things for herself if she is discharged."

Both examiners concluded that appellant was unable to provide for her basic needs.

The court agreed with the examiners that appellant was not able to provide for her basic needs. The court's conclusion appears to have been based primarily on appellant's condition at the hearing rather than on evidence of actual past failures by appellant to provide for her needs. The court noted that it was "very obvious" that appellant was "just not stable today," and it found that her "inability to interact is so great that she would be an immediate risk of death or serious physical injury." It further found that she was "either unwilling, unable, or unlikely to participate in treatment on a voluntary basis." Accordingly, the court ordered that appellant be committed.

■  On appeal, appellant makes two assignments of error, arguing that the state failed to prove either of the two statutory prongs of the test for a "basic needs" commitment. In the first assignment of error, she argues that the trial court erred in concluding that clear and convincing evidence showed that she was unable to provide for her basic needs. In the second, she similarly challenges the sufficiency of the evidence in support of the court's conclusion that she was not receiving care necessary to her health and safety. We consider both assignments of error together.

■■  ORS 426.130(1) provides that a court may subject a person to involuntary commitment if the state shows, by clear and convincing evidence, that the person is mentally ill. *See State v. Shorett*, 194 Or App 587, 595, 95 P3d 1146 (2004) ("Clear and convincing evidence is evidence of extraordinary persuasiveness, such that the truth of the facts asserted is highly probable." (Citations and internal quotation marks omitted.)). ORS 426.005(1)(d) defines "mentally ill person," in part, as

"a person who, because of a mental disorder, is one or more of the following:

"(A)   Dangerous to self or others[; or]

"(B)   Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety[.]"

The Oregon Supreme Court has construed ORS 426.005(1)(d) to be consistent with the federal constitutional standard for involuntary commitment based on mental illness. *See O'Neill*, 274 Or at 67. According to that standard, "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson*, 422 US 563, 576, 95 S Ct 2486, 45 L Ed 2d 396 (1975); *see also O'Neill*, 274 Or at 66 (the purpose of Oregon's mental commitment statutes is to provide for involuntary commitment of an "individual who is dangerous or not capable of surviving safely in freedom"). This court has explained that a person is subject to a "basic needs" commitment "if clear and convincing evidence demonstrates that, due to a mental disorder, there is a likelihood that the person probably would not survive *in the near future* because the person is unable to provide for basic personal needs and is not receiving care necessary for health or safety." *State v. Bunting*, 112 Or App 143, 146, 826 P2d 1060 (1992) (emphasis added).

In this case, the trial court concluded, based largely on appellant's condition at the hearing, that she was unable to provide for her basic needs and that she would thus not be likely to survive in the near future. We need not try to second-guess the first part of the trial court's conclusion, because evidence in the record nevertheless calls into question the trial court's ultimate conclusion that appellant would not be likely to survive in the near future.

First, there is evidence that, before being hospitalized, appellant had, in fact, been providing for her basic needs—that is, those things that are necessary to survival. *See State v. Brungard*, 101 Or App 67, 71, 789 P2d 683, *adh'd to as modified on recons*, 102 Or App 509, 794 P2d 1257 (1990), *rev den*, 311 Or 427 (1991) ("Basic needs are those things necessary to sustain life.").

Second, even assuming that the evidence of appellant's condition at the time of the hearing was so powerful as to make it reasonable to infer that her situation had worsened to the point that she could no longer provide for her needs on her own, the fact that appellant recognized that she needed help requires us to consider carefully whether her survival was truly in jeopardy. *See State v. Saephan*, 189 Or App 9, 19, 73 P3d 301 (2003) (evidence that an allegedly mentally ill person "recognizes the necessity of some activity on his part to provide for his survival" supports a finding that the person can provide for basic needs). To be sure, merely recognizing that some activity is necessary to survival may not be enough if there is clear and convincing evidence that the person lacks the ability to act on that recognition. However, as we explain below, if he or she is willing to accept help from others and is likely to receive it, commitment is not appropriate. *See* ORS 426.005(1)(d)(B) (a mentally ill person is one who, because of a mental disorder, is unable to provide for basic needs *and* "is not receiving such care as is necessary for health or safety").

■■ Although we consider the facts as they existed at the time of a mental commitment hearing, *North*, 189 Or App at 520, our task is not to determine simply whether the allegedly mentally ill person was, at that time, either providing for his or her basic needs or receiving necessary care from others. Rather, our task is to determine whether the record shows that, if released, the person would likely not have survived in the near future. *Bunting*, 112 Or App at 146. To do that, we must take into consideration evidence of what was likely to happen after the hearing if the person were released. We cannot conclude that a person would likely not survive in the near future if the record shows that, if released, the person would receive appropriate care, even if the record also shows that the person had not been receiving assistance from others at the time of the hospitalization. In other words, we will affirm a judgment ordering commitment on "basic needs" grounds only if there is clear and convincing evidence that the person is unwilling or unable to obtain help from others upon release. *Cf., e.g., Saephan*, 189 Or App at 17-18 (reversing commitment even though, at the time of the hearing, the

appellant had no money, food, lodging, or appropriate clothing; at the hearing, he "identified various persons and entities he planned to ask for assistance in obtaining money, food, or shelter if released").

Here, the record lacks such evidence. At the hearing, appellant acknowledged that she needed help and recognized the important role that medication plays in her condition. Appellant also indicated that her parents had offered to help her obtain medical treatment and she was willing to accept that help. The state offered no reason to doubt appellant's assertion that her parents were willing to help. In fact, appellant's parents attended the hearing, and, although they did not testify, it appears that they were supportive;[1] the trial court even remarked that appellant had "such a nice family here."

In short, there is evidence in the record that appellant was, in fact, able to provide for her basic needs. Even assuming that she was not, however, it is clear that she did not need a great deal of help. The record shows that appellant understood what is necessary for survival, understood the role that medication played, recognized that she needed help in caring for herself, and was willing to accept help from her family. The record also shows that her family knew that she needed help and that they were willing to provide it. Under those circumstances, we cannot conclude that the state proved, by clear and convincing evidence, that appellant was likely not to survive in the near future if released to the community. Thus, the requirements for a "basic needs" commitment have not been established.

Reversed.

**HASELTON, P. J.,** concurring.

The state in this case failed to adduce clear and convincing evidence that appellant "probably would not survive

---

[1] After the outreach worker testified, the trial court stated, "[L]et's reserve the parents as witnesses right now and just talk to [appellant] just a little bit." Following appellant's testimony, neither the state nor appellant called either of the parents to testify, and the court did not ask them any questions. However, appellant's mother interjected at one point to inform the court that, although appellant was not working at the time, her employer had placed her on a leave of absence, adding that "they value her very highly."

*in the near future"* because of her alleged inability to provide for her basic needs. *State v. Bunting,* 112 Or App 143, 146, 826 P2d 1060 (1992) (emphasis added).

Appellant owned her own home, which was clean and well-maintained. There was food in the house, and there was no evidence that appellant had suffered any drastic, health-endangering weight loss from not eating. Indeed, one examiner described appellant as appearing to be "reasonably healthy." Although there was no heat in the house, appellant was wearing several layers of clothing.[1] There was no evidence that appellant was exposed to any potentially unsafe condition in her home.

In sum, regardless of whether appellant's parents were willing to assist her, or whether she was willing to avail herself of any such assistance, appellant's circumstances did not approach the threshold for a "basic needs"-based commitment. *See, e.g., State v. Hayes,* 202 Or App 63, 67-70, 121 P3d 17 (2005).

---

[1] When one of the examiners asked appellant to explain why there was no heat in the house, appellant replied, "I just use the heat and [inaudible] when it's needed[.]"