Argued and submitted October 8, 1984, affirmed November 5, 1985

# STATE OF OREGON,
*Respondent on Review,*

*v.*

# JERRY LEE MILLER,
*Petitioner on Review.*

(TC C82-08-36632; CA A27112; SC S30798)

709 P2d 225

Stephen A. Houze, Portland, argued the cause for petitioner on review. With him on the petition was Birkland, Koch & Houze, Portland.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent on review.

A brief of the American Psychological Association and Oregon Psychological Association as *amici curiae* in support of petitioner was filed by Kit Kinports, Donald N. Bersoff and Ennis, Friedman, Bersoff & Ewing, Washington, D.C., and Jonathan A. Ater and Lindsay, Hart, Neil & Weigler, Portland.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Roberts and Carson, Justices.

CARSON, J.

## CARSON, J.

This case involves the scope of the psychotherapist-patient privilege in Oregon, under OEC 504. Also at issue is the propriety of police conduct with respect to defendant and whether evidence seized from warrantless searches of defendant's person and his residential hotel room was properly admitted at trial. The evidence was admitted on three grounds: as obtained pursuant to a search incident to arrest, as an emergency exception to the warrant requirement, and under the doctrine of inevitable discovery.

## FACTS

Defendant's case was tried to the court on stipulated facts. What follows is a summary of those facts.

Just before midnight on August 6, 1982, defendant telephoned his brother in California and told him that he had just "strangled a kid." Defendant's brother advised him to call a mental hospital or talk to someone who could help him with his problem. Minutes later, defendant telephoned Dammasch State Hospital and asked to speak to a doctor, giving a false name to the secretary-receptionist, Ms. Smith. When Ms. Smith asked him "what the problem [was]," he replied, "Murder. I just killed a man." Ms. Smith then said she would let him speak to a psychiatrist. She asked defendant for the telephone number from which he was calling; he told her the number, stating it was in a public telephone booth.

Ms. Smith telephoned the Clackamas County Sheriff's office, explained the situation, and gave them defendant's telephone number. Then Ms. Smith called Dr. Wendy Saville, the psychiatrist on duty that night at the hospital, and asked her to keep defendant on the line so that the Sheriff's office could "trace the call."

Dr. Saville talked to defendant for 10 or 15 minutes, asking him for background information, similar to what she usually obtained from a patient in a psychiatric interview. At trial, however, she testified that she was only talking to defendant so that the police could find him and that she only asked him about his background because it seemed the "safest" thing to talk about. When she questioned defendant about his name, he asked whether their conversation was confidential. Dr. Saville assured defendant that she would not

disclose his confidences; only then did he give her his true name. During the conversation, defendant made a number of incriminating statements about his homosexual encounter with the victim, his fantasies and his role in the victim's death.

While defendant conversed with Dr. Saville, the Sheriff's office contacted the Portland Police Bureau, which located the telephone booth and sent a uniformed officer to investigate. When the officer arrived at the telephone booth and determined that defendant was the person talking to the state hospital, he physically removed defendant from the telephone booth, patted him down for weapons, found none, removed defendant's wallet and placed him in the locked rear passenger area of his patrol car.

The officer returned to the telephone booth to talk to Dr. Saville. She initially declined to give him any information about what defendant had told her because she believed it was a confidential communication protected by the psycho-therapist-patient privilege. When the officer became "angry" and "pushed" her to tell him what happened, she told him that defendant told her he murdered someone.

The officer returned to the patrol car and questioned defendant, without advising him of his *Miranda* rights.[1] Defendant responded that he wanted to speak to a lawyer, but the officer continued to ask him several times whether he had hurt someone and where the person was. During this questioning, defendant admitted that he had "hurt someone," that he "couldn't wake him up," and indicated that the person was in defendant's room in a residential hotel. Defendant then pulled his room keys out of his pocket and the officer took them.

The officer called for an ambulance, drove to the hotel one block away, entered the locked room using defendant's keys, and discovered the deceased victim's body. The officer returned to the car and for the first time advised defendant of his *Miranda* rights. Defendant did not respond to further police questioning.

Defendant's room was searched, and the victim's body and other evidence was removed. The next day, a search

---

[1] *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

warrant was sought and issued, authorizing a search of defendant's room, from which other evidence was removed.

Defendant was charged with murder. ORS 163.115. He moved to suppress (1) his statements to Ms. Smith; (2) his statements to Dr. Saville; (3) his statements to the police officer; (4) evidence seized from his person; (5) evidence obtained during the warrantless entry and search of his room; and (6) all derivative evidence from the alleged illegalities. The trial court suppressed only his statements to the police officer, made during custodial interrogation without advice of *Miranda* rights and after he asserted his right to counsel. After a trial to the court, defendant was convicted of first degree manslaughter. ORS 163.118.

Defendant appealed to the Court of Appeals, which considered the case *in banc* and wrote four separate opinions. 67 Or App 637, 680 P2d 676 (1984). In the lead opinion, four members of the court relied upon the psychiatrist's statement that she was not diagnosing or treating defendant to conclude that no psychotherapist-patient relationship had been established and defendant could not claim the psychotherapist-patient privilege under OEC 504. The lead opinion also determined that even if defendant's communication to Dr. Saville was privileged, any error in admitting it was harmless because the statements were merely cumulative of the testimony of defendant's brother and the receptionist. The lead opinion held that the police officer had probable cause to arrest defendant outside the telephone booth and to search him incident to that arrest. Finally, the lead opinion held that the evidence seized during the warrantless search of defendant's room was admissible under the "inevitable discovery" doctrine.

Four judges dissented, three believing that defendant's statements to both the psychiatrist and the receptionist were privileged, and one judge determining that only defendant's statements to the psychiatrist were inadmissible. Two other judges specially concurred, agreeing with the dissenters that defendant's statements to the psychiatrist were privileged communications, but also agreeing with the lead opinion that the error in this case was harmless.

Defendant petitioned for review raising the same issues to this court. We will consider separately defendant's

contentions that the following evidence should have been excluded at trial: (1) his statements to Dr. Saville and Ms. Smith; (2) evidence seized from the warrantless searches of defendant's person and room; and (3) evidence derived from his statements to the police officer and from the above-alleged illegalities. For the reasons discussed below, we affirm the Court of Appeals.

## DISCUSSION

### I. PSYCHOTHERAPIST-PATIENT PRIVILEGE

The psychotherapist-patient privilege in Oregon is governed by OEC 504. The purpose of this privilege is to foster a relationship that is deemed important to society and one whose success is dependent upon full and free communication. Rule 504 combines the privileges for psychologists and psychiatrists, which were recognized separately under prior law, into a psychotherapist-patient privilege, which applies in both civil and criminal cases.[2] Kirkpatrick, Oregon Evidence 160 (1982) (hereinafter cited as Kirkpatrick).

OEC 504(2) provides:

"A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purposes of diagnosis or treatment of the patient's mental or emotional condition among the patient, the patient's psychotherapist or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family."

"Patient" is defined as "a person who consults or is examined or interviewed by a psychotherapist." OEC 504(1)(b). "Psychotherapist" is defined as:

"* * * a person who is licensed, registered, certified or otherwise authorized under the laws of any state to engage in the diagnosis or treatment of a mental or emotional condition, or reasonably believed by the patient so to be, while so engaged." OEC 504(1)(c).

"Confidential communication" is defined as:

---

[2] OEC 504 became effective on January 1, 1982. Or Laws 1981, ch 892, § 101. Under prior law the psychiatrist-patient privilege did not apply in criminal cases, but the psychologist-patient privilege did. Under OEC 504-1, the physician-patient privilege still applies only in civil proceedings.

"* * * a communication not intended to be disclosed to third persons except: Persons present to further the interest of the patient in the consultation, examination or interview; persons reasonably necessary for the transmission of the communication; or persons who are participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family." OEC 504(1)(a).

The need for the privilege is today widely recognized. *See, e.g.,* the cases and commentaries cited in *State ex rel Juv. Dept. v. Martin,* 271 Or 603, 606 nn 2, 3, 533 P2d 780 (1975). "Of all professional groups, psychotherapists have one of the strongest justifications for a broad privilege." Kirkpatrick, *Reforming Evidence Law in Oregon,* 59 Or L Rev 43, 77 (1980). The parts of OEC 504 relevant herein were taken verbatim from proposed Federal Rule of Evidence 504.[3] Legislative Commentary to OEC 504, Kirkpatrick, *supra,* at 156. The need for the privilege is stated convincingly in the Advisory Committee's Note to Proposed FRE 504, as follows:

"Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients of confidentiality and, indeed, privileged communication. . . [T]here is wide agreement that confidentiality is a *sine qua non* for successful psychiatric treatment. The relationship may well be likened to that of the priest-penitent or the lawyer-client. * * * A threat to secrecy blocks successful treatment." Report No. 45, Group for the Advancement of Psychiatry 92 (1960), *cited in* 56 FRD 183, 242 (1972).

The burden rests on the person seeking to assert the privilege to show that both that person and the nature of the testimony offered are within the ambit of the privilege. *Groff v. SIAC,* 246 Or 557, 565, 426 P2d 738 (1967).

A. *Statements to Psychiatrist.*

The rule only protects from disclosure a "confidential communication," defined as "a communication not intended to be disclosed to third persons." OEC 504(1)(a). The identical

---

[3] FRE 504 was approved by the United States Supreme Court and submitted to Congress, but not enacted.

language in FRE 504 has been construed to focus on the patient's intent. *See, e.g., Lora v. Bd. of Ed. of City of New York,* 74 FRD 565 (ED NY 1977), where the privilege was held not to apply to diagnostic and referral files of emotionally handicapped students because it was unlikely that the students or their families expected privacy, and third parties had access to the data. "[I]f a patient makes a communication expecting it to be disclosed, the privilege ceases." 2 Weinstein & Berger, Weinstein's Evidence, § 504[05], 504-21 (1985).[4] Whether there is an intent to avoid disclosure may be inferred from the circumstances. For example, a communication made in public or intended to be relayed to outsiders would not be considered confidential.[5]

■ The communication must also be "made for the purposes of diagnosis or treatment." OEC 504(2). The purpose of the communication may be inferred from the surrounding circumstances. A patient's reasonable belief that the communication is being made for the purposes of diagnosis or treatment will suffice. This point is more fully discussed *infra.*

The definition of a "psychotherapist" in OEC 504(1)(c) has two parts. The person must be both lawfully authorized to engage in diagnosis or treatment of the patient's mental or emotional condition (or reasonably believed by the patient so to be) and be "so engaged" when the communication which is intended to be kept confidential is made.

The trial court and four judges on the Court of Appeals seem to have concluded that defendant could not be a "patient" and invoke the privilege until a psychotherapist-patient relationship had been established that had been "agreed upon by both sides." They considered controlling the

---

[4] Similarly, a telephone communication between a defendant and a psychiatric social worker in which the defendant admitted he had "just killed somebody" was held not privileged, because that defendant told the social worker that he understood the need to inform the police. *State v. Martin,* 274 NW2d 893 (SD), *cert den* 444 US 883 (1979).

[5] This is consistent with the interpretation given the identical language in the attorney-client privilege, OEC 503(1)(b). *See State ex rel No. Pac. Lumber Co. v. Unis,* 282 Or 457, 460-61, 579 P2d 1291 (1978), and *Baum v. Denn,* 187 Or 401, 406-07, 211 P2d 478 (1949). The Advisory Committee Commentary to proposed OEC 503 in the Report of the Legislative Interim Committee on the Judiciary 70 (1980) states: "Unless the intent to disclose to third persons is apparent, the communication is confidential. Taking or failing to take precautions, however, can be considered as bearing on intent to maintain confidentiality."

fact that defendant had not previously been a patient at the hospital, that the psychiatrist did not anticipate an ongoing psychotherapist-patient relationship to develop, and that she testified she was not actually diagnosing or treating defendant, but only keeping him on the telephone line until the police arrived.

■ ■ A previously established psychotherapist-patient relationship is not required before the privilege can be invoked. In *State v. O'Neill,* 274 Or 59, 545 P2d 97 (1976), for example, this court held that the physician-patient privilege was applicable where the defendant was brought for the first time to a hospital crisis unit for observation and treatment. The evidence of a privileged relationship was in one sense even weaker than in this case because in *O'Neill* the defendant was forcibly taken into custody by the police at the request of his mother and brought to the hospital. He did not voluntarily seek treatment or intend to enter into a privileged relationship, as was apparently done here.

Nothing in the legislative history of OEC 504 or proposed FRE 504 suggests that the phrase "while so engaged" should be limited to a contractual or employment relationship. It is likely that the requirement that a psychotherapist be "engaged" in diagnosis or treatment was intended to exclude communications to licensed mental health professionals engaged in non-clinical work, such as scientific research or teaching. The Legislative Commentary to OEC 504 states:

> "The definition of 'patient' in Rule 504 and 504-1 does not include a person submitting to examination *for scientific purposes.* This limitation agrees with the current Oregon requirement that a physician be consulted for treatment in order that the physician-patient privilege attach. *State v. O'Neill,* 274 Or 59, 545 P2d 97 (1976)." Kirkpatrick, *supra,* at 156. (Emphasis supplied.)

Similarly, proposed FRE 504 does "not [apply] when a person consults a psychologist engaged in advertising, market research and the like." 2 Weinstein & Berger, *supra,* at 504-21.[6]

---

[6] The language in the earlier drafts of proposed FRE 504 is instructive. The 1969 draft read: "a person licensed or certified as a psychologist under the laws of any state or nation, who devotes a substantial portion of his time to the practice of clinical

In light of the policy behind the rule and its similarity to the attorney-client privilege, we conclude that the psychotherapist-patient privilege protects communications made in an initial conference for the purpose of establishing a psychotherapist-patient relationship, even if such a relationship is never actually formed. The psychotherapist-patient privilege "necessarily includes communications made in the course of diagnostic interviews and examinations which might reasonably lead to psychotherapy." *Allred v. State,* 554 P2d 411, 420 (Alaska 1976). This is required to encourage patients to discuss frankly and freely their mental or emotional problems so that the professional can accurately determine whether he or she is qualified to treat them. If information revealed during the initial conference indicates to either party that an ongoing professional relationship should not be formed, the confidences revealed in the initial consultation are protected nevertheless.

 This is not to say, however, that a prospective patient who meets a person known to be a psychotherapist in a supermarket and immediately makes an unsolicited confession can claim the privilege solely because the patient intends the communication to be confidential and hopes to receive diagnosis or treatment. In order for statements made in an initial encounter to be covered by the privilege, the psychotherapist and patient must agree, or at least reasonably appear to agree, that they intend to establish a psychotherapist-patient relationship. There must be some indication from the psychotherapist that he or she is willing to embark upon such a relationship. An indication of this intent may be inferred from the circumstances. It might come from the setting alone. For example, if a prospective patient talks to a licensed psychotherapist in a professional practice setting, such as a mental health clinic or a private practice office, the patient could fairly infer that the psychotherapist has indicated a willingness to enter into a confidential relationship. The requisite willingness could also be shown by the psychotherapist's behavior, apart from the setting. If the prospective

---

psychology." The 1971 draft changed the phrase beginning with "who" to read "who devotes all or a part of his time to the practice of clinical psychology." The phrase referring to the practice of "clinical psychology" was eliminated, "but no change in meaning was intended." 2 Weinstein & Berger, Weinstein's Evidence, § 504[04], 504-20 (1985).

client in the above-stated supermarket example is assured by the psychotherapist that his statements will be kept confidential and is questioned about his problem, then the therapist has reasonably indicated a willingness to enter into a psychotherapist-patient relationship, and the privilege attaches when the first words are spoken.

Where a psychotherapist has given reasonable assurances to the patient that they are embarking upon a privileged relationship, an ulterior motive or purpose on the part of the psychotherapist will not prevent the patient from claiming the privilege. We agree with Judge Richardson's dissent in the Court of Appeals:

> "* * * [T]he relevant point is not *why* she [the psychiatrist] spoke with him, but whether the *substance* of the conversation came within the privilege defined by OEC 504. This was not a situation in which the psychiatrist *told* defendant that she did not understand their conversation to be related to her professional role, or one in which she listened in silence while defendant spoke, or even one in which she simply engaged in polite chatter and offered comforting reassurances. She spoke with defendant in the basic way she would speak with a patient in a diagnostic or treating situation." *State v. Miller, supra,* 67 Or App at 651. (Emphasis in original.)

Some courts facing similar situations have held that the physician-patient relationship is created "by implication," for purposes of the privilege, when a physician attempts to testify as to information acquired from the patient on the ground that he never actually treated the patient, but only examined the patient for another purpose of which the patient was not aware. For example, in *Ballard v. Yellow Cab Co.,* 20 Wash 2d 67, 145 P2d 1019 (1944), a person was injured by a taxicab and taken to a public hospital, where she submitted to an examination by a physician without knowing that the examination was being made for the taxicab company. The Washington Supreme Court said that the injured woman, by submitting to the examination, "to all intents and purposes became his patient" and could claim the privilege. That court said:

> "It is not necessary in order to create the relation of physician and patient that he should actually treat the patient. If he makes an examination of the patient, with her knowledge and consent, she believing that the examination is

being made for the purpose of treating her, then the relation is created by implication, and *it is wholly immaterial what the secret object or purpose of the physician was in making it; * * * if such a thing as that could be done, then the privilege accorded the patient could be taken from her by trick or fraud."* 20 Wash 2d at 72, quoting from *Smart v. Kansas City,* 208 Mo 162, 192, 105 SW 709 (1907). (Emphasis supplied.)

*See also Arizona & N M Ry Co. v. Clark,* 207 F 817 (9th Cir 1913); *State v. Steelman,* 120 Ariz 1213, 585 P2d 1213 (1978)(stating that where a patient is examined believing the purpose to be treatment, the patient has a right to rely upon the confidence imposed in the physician); *People v. Decina,* 2 NY 2d 133, 157 NYS 2d 558, 138 NE2d 799 (1956) (stating that whether or not a physician-patient relationship exists does not depend upon whether actual treatment was undertaken; it exists when a patient could reasonably have regarded the physician as acting in a professional capacity).

Thus, where a patient consults a psychotherapist for professional assistance for a mental or emotional problem and reasonably believes that the psychotherapist is willing to embark upon a professional relationship, the fact that the psychotherapist has a secret ulterior purpose for the interview or examination will not prevent the patient from claiming the privilege as to confidential communications. To hold otherwise would effectively transfer the privilege from the patient (who holds it under OEC 504(3)) to the psychotherapist. Such a shift is not supported by the language of the rule, its underlying policy, or caselaw.

■ Turning to the facts of this case, defendant herein specifically requested, and was assured of, confidentiality. Only then did he divulge his true name. This is a clear indication that defendant intended his conversation with the psychiatrist to be confidential.

■ At his brother's suggestion, defendant telephoned Dammasch State Hospital and asked to speak to a doctor. He was described as distraught and depressed. No one has disputed that he was seeking professional assistance for his emotional condition. He talked to a psychiatrist for ten or 15 minutes, until the conversation was interrupted by the police officer removing him from the telephone booth. During this conversation the psychiatrist did not engage in "small talk" or

idle chatter. She testified that she spoke to defendant and questioned him in much the same way she would have in a psychiatric interview. Based upon these facts, the only reasonable conclusion is that defendant reasonably believed that the communication was made "for the purposes of diagnosis or treatment."

■ We also conclude that, if Dr. Saville was a "psychotherapist" within the meaning of the rule, then defendant was a "patient" under OEC 504(1)(b), because he both "consulted" and was "interviewed by" her.

■ Dr. Saville was a licensed psychiatrist, authorized by statute "to engage in the diagnosis or treatment of a mental or emotional condition." The only dispute concerns whether she was "so engaged" while she was talking to defendant by telephone. She was the psychiatrist on duty at Dammasch State Hospital, a professional practice setting.[7] She assured defendant of confidentiality and questioned him about his problem in the usual way that clinical interviews, as necessary precursors to diagnosis and treatment, are conducted. Although they had no prior psychotherapist-patient relationship and she testified that she did not anticipate forming one, it was not disputed that she led defendant reasonably to believe that she was willing to embark upon such a relationship. The fact that she had an ulterior purpose (keeping defendant on the telephone line until the police came) does not prevent him from claiming the privilege. We thus hold that defendant's statements to Dr. Saville were covered by the psychotherapist-patient privilege and should not have been admitted into evidence.

B. *Ethical Obligation to Violate Confidentiality Distinguished.*

■ The trial court below was persuaded that psychotherapists have an ethical obligation to divulge a patient's confidences whenever it might be possible to render aid to a victim of the patient's violence. It is important to distinguish between the evidentiary privilege which is claimed by a

---

[7] The psychiatrist testified that, although Dammasch State Hospital does not provide outpatient services, counseling is sometimes provided by telephone to persons who are upset or in crisis situations.

patient, or a psychotherapist in behalf of a patient (OEC 504(3)), to prevent disclosure of confidential information *at trial,* and the discretionary authority of a public health care provider[8] or any ethical obligation that a licensed psychotherapist may have to notify the police or other proper authority in order to aid a victim or warn of future dangerousness. The public interest to be served by notifying the police, in most cases, could be achieved by divulging only that information needed to show why a clear and immediate danger is believed to exist. It would rarely justify the full disclosure of the patient's confidences to the police, and never justify a full disclosure in open court, long after any possible danger has passed. *See generally* Slovenko, *Psychiatry and a Second Look at the Medical Privilege,* 6 Wayne L Rev 175, 197-98 (1960).

The legislature specifically provided an exception to the attorney-client privilege for client's communications about future crimes (OEC 503(4)(a)), but failed to do so for the psychotherapist-patient privilege. This suggests that the legislature has struck the balance in favor of protecting communications to psychotherapists, even when harm is threatened, probably for the same reason that persuaded the committee who drafted the similar federal rule: "[T]he assumption [is] that less harm will [occur] if patients feel free to ventilate their intentions." 2 Weinstein & Berger, *supra,* at 504-24.[9]

---

[8] Under Oregon law, a *health care* "provider," defined as "any public agency or publicly operated institution * * * that provides health care services," *"may"* notify the appropriate authority when "information obtained in the course of diagnosis, evaluation or treatment of a patient * * * in the professional judgment of the provider indicates a clear and immediate danger to others or to society." ORS 179.505(10). (Emphasis supplied.) There is no *duty* to report, under Oregon law, but public health care providers have the *discretion* to do so. The statute also provides: "A decision not to disclose information under this subsection shall not subject the provider to any civil liability." ORS 179.505(10).

[9] The committee that drafted the Connecticut psychiatrist-patient privilege reached the same conclusion:

"Its members were persuaded that, as a class, patients willing to express to psychiatrists their intentions to commit crime are not ordinarily likely to carry out that intention. Instead, they are making a plea for help. The very making of these pleas affords the psychiatrist his unique opportunity to work with patients in an attempt to resolve their problems. Such resolution would be impeded if patients were unable to speak freely for fear of possible disclosure at a later date in a legal proceeding." Goldstein & Katz, *Psychiatrist-Patient Privilege: The GAP Proposal and the Connecticut Statute,* 36 Conn B J 175, 188 (1962).

*Compare Tarasoff v. Regents of University of California,* 17 Cal 3d 425, 131 Cal Rptr 14, 551 P2d 334 (1976); *McIntosh v. Milano,* 168 NJ Super 446, 403 A2d 500 (1979)

## C. *Statements to Secretary-Receptionist.*

The issue of when and to what extent communications made to agents and assistants of professional persons are protected by the evidentiary privileges is one with which many courts have wrestled. *See, e.g.,* McCormick, Evidence §§ 91, 101 (3d ed 1984); *Annot,* 14 ALR4th 594 (1982); *Annot,* 47 ALR2d 742 (1956); Sobel, *The Confidential Communication Element of the Attorney-Client Privilege,* 4 Cardozo L Rev 649 (1983); Note, *Evidence - Privileged Communications - Physician and Patient - Medical Assistants and Doctrine of Agency,* 22 Marq L Rev 211 (1938).

OEC 504(1)(a) provides three separate categories of third persons to whom disclosures of confidential information are protected by the psychotherapist-patient privilege. The lead opinion in the Court of Appeals stated that the clause in OEC 504(1)(a) most applicable to the Dammasch State Hospital secretary-receptionist was the one which makes confidential those communications disclosed to "[p]ersons present to further the interest of the patient in the consultation, examination or interview." The opinion concluded that, because Ms. Smith was not physically present during defendant's consultation with the psychiatrist, the statements to Ms. Smith were not "confidential communications" within the meaning of OEC 504(1)(a).

We agree, however, with defendant and the dissent by Judge Richardson that the clause in OEC 504(1)(a) applicable to the secretary-receptionist is the one which renders confidential those communications to "persons reasonably necessary for the transmission of the communication." That clause contains no requirement that the person be present. Its meaning, however, is not precisely clear. The Legislative Commentary to OEC 504(1)(a) states: " 'Confidential communication' is defined in terms conformable to those of the lawyer-client privilege." Kirkpatrick, *supra,* at 156. The attorney-client privilege (OEC 503(1)(b)) contains the identical phrase, but the Legislative Commentary to it is unfortunately sparse. It states: "The rule allows some disclosure beyond the immediate circle of lawyer and client and

---

(court adopts *Tarasoff*); Comment, *A Psychotherapist Who Knows or Should Know His Patient Intends Violence to Another Incurs a Duty to Warn,* 7 Cumberland L Rev 551 (1977).

their representatives without impairing confidentiality, as a practical matter." Kirkpatrick, *supra,* at 141. Professor Kirkpatrick suggests stenographers and interpreters, as examples of "persons reasonably necessary for the transmission of the communication." Kirkpatrick, *supra,* at 147.

Because the Legislative Commentary to OEC 504(1)(a) points to the identical language in the attorney-client privilege, we see no reason to construe these two phrases differently. Courts have held that where the help of an interpreter is necessary to enable the client to consult the lawyer, the interpreter's presence does not deprive the confidential communication of its privileged character. *See, e.g., State v. Loponio,* 85 NJL 357, 88 A 1045 (1913); *Du Barre v. Linette,* Peake 108, 170 Eng Rep 96 (NP 1791); McCormick, *supra,* at 218. Some courts have relied upon the analogy of an interpreter to apply the attorney-client privilege to an accountant employed by the lawyer to assist in the litigation. *See, e.g., United States v. Kovel,* 296 F2d 918 (2nd Cir 1961); *compare Himmelfarb v. United States,* 175 F2d 924 (9th Cir 1949).

The Advisory Committee's Note to proposed FRE 503(a)(4) describes this clause as treating the status of employees who are used in the process of communicating, as distinguished from those who are parties to the communication. "Disclosure to those reasonably necessary for transmitting the communication has readily been recognized as not destroying the privilege. Secretaries, clerks and interpreters fall within this category." 2 Weinstein & Berger, *supra,* at 503-30. McCormick states that the presence of agents, secretaries or clerks, as intermediaries, will be assumed not to militate against the confidential nature of the consultation. "It is the way business is generally done and that is enough." McCormick, *supra,* at 218.

■■■ Two things about this clause in OEC 504(1)(a) speak against a narrow view of those third persons who are included within the privilege. The first is the words "reasonably necessary" in the clause; the second is the Legislative Commentary to OEC 503 which says the rule allows disclosure beyond the immediate circle of professional and patient "as a practical matter." We decline to limit the phrase to translators or persons who *directly* assist a patient to communicate with a

psychotherapist, because such persons would be *indispensably* necessary to the transmission of the communication. As a practical matter, other persons, such as stenographers or office employees, may be "reasonably necessary" to the transmission of confidential communications. Limiting this clause to persons who are the "medium of communication" would not be consonant with the practical side of the day-to-day procedures of professionals who offer mental health services to the public. Few psychotherapists and, similarly, few doctors or lawyers answer their own telephones. Most rely upon secretaries, receptionists, answering services and other assistants to act as intermediaries between themselves and their patients. These intermediaries receive, transmit and record patient information, some of which may be confidential. The policy and purpose of the privilege, as well as the practical side of professional service delivery, require that the privilege include those persons who gather, transmit or record confidential patient information, if acting at the direction of a psychotherapist.

The secretary-receptionist in the instant case testified that she had access to confidential patient information. One of her jobs on the graveyard shift was to collect information from persons entering the state hospital as patients. She also was responsible for screening incoming telephone calls to the psychiatrist on duty. She testified that all incoming calls to the state hospital come through her switchboard, making it impossible for anyone to talk to a psychotherapist without being put through by her. She was not merely a switchboard operator, however, because she testified that she was instructed to obtain the caller's name and determine if he or she was a former patient and the reason for the call, before connecting the caller with the psychiatrist.

When defendant called the state hospital, seeking professional services, he asked to speak to a doctor. Ms. Smith asked him what the problem was. A reasonable person in defendant's position could have believed he had to tell her his problem in order to get past her to talk to a doctor. In this circumstance, we believe that she was an assistant employed in the process of communication and thus was a person "reasonably necessary for the transmission of the communication," under OEC 504(1)(a). Defendant's statements to

her are included within the scope of the psychotherapist-patient privilege. It was error to admit them at trial.[10]

## II. HARMLESS ERROR

 The next inquiry is whether the error in admitting the testimony of the psychiatrist and secretary-receptionist was prejudicial. OEC 103(1) provides: "Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." According to the Legislative Commentary to OEC 103(1), appellate courts are required to affirm the trial court, notwithstanding evidential error, whenever there is: (1) substantial and convincing evidence of guilt

---

[10] Although we hold that defendant's statements to Dammasch State Hospital personnel were inadmissible on state law grounds, we must yet consider defendant's contentions that his statements were constitutionally involuntary and obtained by the police in an impermissible invasion of his right of privacy. If these constitutional claims have merit, then everything derived from defendant's statements to the hospital personnel would be suppressible as "fruit of the poisonous tree."

The fundamental question regarding the voluntariness of a confession is whether it is the product of the free expression of the confessor's will. *Brown v. Illinois,* 422 US 590, 95 S Ct 2254, 45 L Ed 2d 416 (1975). The test is whether the confession was extracted by any sort of threats or violence or obtained by any direct or implied promises, or by exertion of any improper influence. *Hutto v. Ross,* 429 US 28, 97 S Ct 202, 50 L Ed 2d 194 (1976). The test for voluntariness is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973). Applying the voluntariness test to the facts of this case, we conclude that defendant's confession was not induced by the psychiatrist's promise of confidentiality. Before defendant sought and received verification from the psychiatrist that their conversation was confidential, he had already told her and the secretary-receptionist several facts relating to his role in the victim's death and his own whereabouts. Under the totality of the circumstances test, we conclude that defendant's statements to Dammasch State Hospital personnel were voluntarily given.

Defendant also argues that the revelation to the police of his statements to the hospital personnel violated his state and federal constitutional rights of privacy. While the Supreme Court has recognized a right of personal privacy, or zones of privacy, under the federal constitution, the precise origins and dimensions are as yet undefined. *See, e.g., Planned Parenthood of Cent Mo v. Danforth,* 428 US 52, 96 S Ct 2831, 49 L Ed 2d 788 (1976); *Roe v. Wade,* 410 US 113, 93 S Ct 705, 35 L Ed 2d 147 (1973); *Griswold v. Connecticut,* 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1964). We believe that defendant's contentions are answered by *Whalen v. Roe,* 429 US 589, 97 S Ct 869, 51 L Ed 2d 64 (1977), where the Supreme Court reversed a District Court decision which had held that the doctor-patient relationship is one of the zones of privacy accorded constitutional protection. In *Whalen,* the Court found that a state statute requiring physicians to identify patients obtaining certain prescription drugs did not invade any right or liberty protected by the Fourth or Fourteenth Amendments. Based upon the facts of the instant case and the arguments presented, we see no reason to adopt a different rule under the Oregon Constitution.

in a criminal case, and (2) little, if any, likelihood that the error affected the verdict. Kirkpatrick, *supra,* at 12. We have so held in *State v. Mains,* 295 Or 640, 669 P2d 1112 (1983). This test is consistent with the standards for prejudicial error set forth in Article VII (Amended), section 3, of the Oregon Constitution[11] and interpreted in such prior cases as *State v. Naylor,* 291 Or 191, 629 P2d 1308 (1981); *State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973); and *State v. McLean,* 255 Or 464, 468 P2d 521 (1970).

Defendant was found guilty of first degree manslaughter on a stipulated facts trial. The trial court determined that defendant's conduct in strangling the victim by ligature during a homosexual act was committed "recklessly under circumstances manifesting extreme indifference to the value of human life."[12] ORS 163.118(1)(a). The Court of Appeals' lead opinion concluded that, even if defendant's statements to the psychiatrist were privileged and it was error to admit them, the psychiatrist's testimony was harmless, under the facts of this case, because it was cumulative of the testimony already before the court from defendant's brother and the secretary-receptionist. We conclude, however, that the testimony of the psychiatrist was significantly different from the testimony of either the secretary-receptionist or the brother and considerably more damaging to defendant on the issue of his culpable mental state. Nevertheless, after review of the record, even absent the testimony of the secretary-receptionist and the psychiatrist, we are satisfied that there was substantial and convincing evidence of defendant's guilt,

---

[11] Article VII (Amended), section 3, of the Oregon Constitution provides:

"* * * If the supreme court shall be of the opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial; * * *. Provided, that nothing in this section shall be construed to authorize the supreme court to find the defendant in a criminal case guilty of an offense for which a greater penalty is provided than that of which the accused was convicted in the lower court."

[12] ORS 161.085(9) defines "recklessly" as follows:

" 'Recklessly' * * * means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

and we find there was very little, if any, likelihood that the evidential error affected the trial court's decision.[13]

## III. WARRANTLESS SEARCHES

### A. *Evidence Seized From Defendant's Person.*

■ Defendant maintains that the warrantless search of his person is a ground for the suppression of all physical evidence directly seized and of everything seized later from his room because it was derived from the illegal search, citing *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963). The trial court held that the wallet, containing defendant's identification, seized during the original pat-down of defendant, and the keys, seized by the police officer during his interrogation of defendant, were properly obtained pursuant to a search incident to a lawful arrest. The Court of Appeals agreed. Defendant agrees that he was under arrest, but contends that it was unlawful because the police officer lacked probable cause. Defendant argues that the illegal arrest is an independent ground to warrant the suppression of all the physical evidence seized from defendant's person and room because it was derived from the prior illegality under the *Wong Sun* analysis.

Under ORS 133.310(1)(a), a police officer may arrest a suspect without a warrant when there is probable cause to believe the person has committed a felony or a Class A misdemeanor.[14] Probable cause must exist at the time the arrest is made, not subsequently. We conclude that, when the officer arrived at the telephone booth, he knew that moments before a man had made an unsolicited confession to homicide from that telephone booth. After the officer confirmed that

---

[13] The two-part rule discussed above for determining harmless evidential error in a criminal case is applicable to errors of state law. A different rule applies if the error is a violation of a federal constitutional right. A federal constitutional violation must be shown to be harmless beyond a reasonable doubt in order for the conviction to be affirmed. *Chapman v. California,* 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967); *State v. Stilling,* 285 Or 293, 304, 590 P2d 1223, *cert den* 444 US 880 (1979). Even if we were to assume that the error in admitting the testimony of the psychiatrist and the secretary-receptionist involved a violation of federal constitutional principles, we find in this case that the error was harmless beyond a reasonable doubt.

[14] Probable cause is defined as follows:

"'Probable cause' means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." ORS 131.005(11).

defendant was the person talking to Dammasch State Hospital, he had probable cause to arrest defendant on suspicion of murder, notwithstanding the officer's testimony that defendant was neither in custody nor under arrest. Under federal constitutional standards, when probable cause to arrest exists, the fact that an officer does not subjectively believe a person is under arrest does not affect the officer's right to make a valid arrest and search incident thereto. *See State v. Cloman,* 254 Or 1, 12, 456 P2d 67 (1969), where we held that if officers have probable cause to arrest, the arrest is not rendered illegal because the officers testified to another, improper reason for the arrest. We hold that the search of defendant's person and seizure of his wallet, and later his keys, were proper and did not exceed the scope of a search incident to a lawful arrest.

B. *Evidence Derived From Statements to Police Officer.*

 The trial court excluded defendant's statements to the police officer on the ground that they were obtained as a result of custodial interrogation without advice of *Miranda* rights and after defendant asserted his right to counsel. The state did not appeal this issue. The admission of evidence derived from these statements, however, is at issue. Defendant contends that his keys and all the physical evidence seized from his room were derived from this *Miranda*-violative confession and should have been suppressed as "tainted" fruits of that prior illegality, citing *Wong Sun v. United States, supra.* Defendant raises no claim under the Oregon Constitution.

We acknowledge that recent United States Supreme Court cases have emphasized that the *Miranda* warning requirements are not themselves rights protected by the Constitution, but are merely "prophylactic measures" to ensure that the Fifth Amendment right against compulsory self-incrimination is protected. In *New York v. Quarles,* 467 US 649, 104 S Ct 2626, 81 L Ed 2d 550 (1984), a 5-4 decision by Justice Rehnquist, the Court adopted a public safety exception to the *Miranda* warning requirements, grounded on the belief that when a threat to public safety exists, the need for answers to questions outweighs the need for *Miranda* warnings. In *Oregon v. Elstad,* 470 US ___, 105 S Ct 1285, 84 L Ed 2d 222 (1985), a 6-3 decision authored by Justice O'Connor,

the Court stated in dictum that evidence which is the "fruit" of a *Miranda* violation need not be suppressed under a derivative evidence analysis. The actual holding in *Elstad,* a successive interrogation case, however, is considerably narrower.

We conclude that these two cases are inapplicable because the instant case involves two separate, but related, illegalities: (1) custodial interrogation without advice of *Miranda* rights, and (2) continued questioning after defendant asserted his Fifth Amendment right to have counsel present during custodial interrogation. While we hesitate to speculate about the degree of continuing vitality of *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), the Supreme Court has unequivocally stated that in custodial interrogation, if an accused requests counsel, questioning must cease until an attorney is present. *Edwards v. Arizona,* 451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981). A valid waiver of the Fifth Amendment right to have counsel present during custodial interrogation cannot be shown by the fact that a defendant responded to further questioning. The accused must initiate further conversation with the police. *Edwards v. Arizona, supra,* 451 US at 484.

The facts in the instant case do not support the conclusion that defendant waived his constitutional privilege against self-incrimination. Neither did he initiate further communication with the police. The questioning of a suspect in custody after he has asserted his right to counsel is a Fifth Amendment violation, and the doctrine of *Wong Sun* applies. We do not think that *Quarles's* public safety exception to *Miranda* warning requirements extends to a constitutional violation. We find *Elstad* inapposite for the same reason.[15] Defendant is correct that the "fruit of the poisonous tree" doctrine would apply to "taint" all the physical evidence, including the victim's body, seized from defendant's room, because all were derived from an unconstitutional custodial interrogation, unless admissible on some independent ground.

---

[15] For the same reason, we do not agree with the state's contention that the "rescue doctrine" (not previously recognized in Oregon) applies to render admissible the "fruits" of defendant's unconstitutionally obtained confession. *See People v. Dean,* 39 Cal App 3d 875, 114 Cal Rptr 555 (1974).

## C. *Evidence Seized From Defendant's Room.*

Warrantless entries and searches of premises are *per se* unreasonable unless they fall within one of the few, carefully circumscribed exceptions to the warrant requirement. *Katz v. United States,* 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967). The exclusionary rule operates to prevent evidence illegally obtained as a result of a warrantless search from being used to secure a conviction. Thus, the entry and search of defendant's room without a search warrant are independent grounds for suppression of the evidence seized therefrom.

The trial court admitted the evidence seized from the warrantless search of defendant's room both on the grounds of an emergency exception to the warrant requirement and under the inevitable discovery doctrine. The Court of Appeals held the evidence admissible under the inevitable discovery rule, and did not consider the emergency exception argument. In the circumstances of this case, we conclude that both are required because two discrete constitutional barriers were crossed by the police officer after he took defendant into custody. First, defendant's Fifth Amendment right to have counsel present during custodial interrogation was violated when the officer continued to question defendant after he requested an attorney. Using the information thus obtained, the officer proceeded to defendant's rented room. At the room door the officer encountered a second constitutional barrier, the Fourth Amendment. To pass the threshold, the officer was required to have a valid warrant, or the circumstances must have come within one of the exceptions to the Fourth Amendment warrant requirement.

### 1. *Inevitable Discovery Doctrine.*

One exception to the exclusionary rule is the inevitable discovery doctrine, recognized recently by the United States Supreme Court in *Nix v. Williams,* 467 US 431, 104 S Ct 2501, 81 L Ed 2d 377 (1984). The inevitable discovery doctrine permits the prosecution to purge the taint of illegally obtained evidence by proving, by a preponderance of the evidence, that such evidence inevitably would have been discovered, absent the illegality, by proper and predictable police investigatory procedures. *Nix v. Williams, supra,* 467 US at ___, 81 L Ed 2d at 387. *Nix* is the Iowa case where the police officer's "Christian burial speech" was held to violate

the accused's Sixth Amendment right to counsel,[16] but evidence of the condition of the victim's body was admitted at trial because the state proved that the body inevitably would have been found within a short period of time by a search party already under way.

Under federal constitutional analysis, the major requirement of the inevitable discovery doctrine is that the evidence *would have been* discovered, absent the illegality, by proper and predictable investigatory procedures. It is not enough to show that the evidence "might" or "could have been" otherwise obtained. *See, e.g., United States v. Finucan,* 708 F2d 838 (1st Cir 1983) (must be certain evidence would otherwise have been found; it is not enough that lawful means of acquiring the evidence existed); *United States v. Romero,* 692 F2d 699 (10th Cir 1982) (warning against resort to speculation, and stressing that the evidence in that case would have been discovered shortly through a lawful investigation already under way); *see generally* 3 LaFave, Search and Seizure § 11.4 (1978 & Supp 1985); Maguire, *How to Unpoison the Fruit-The Fourth Amendment and the Exclusionary Rule,* 55 J Crim L C & P S 307, 315 (1964).

██ ██ We are persuaded that the doctrine of inevitable discovery encompasses a two-part test. The prosecution must establish by a preponderance of the evidence: (1) that certain proper and predictable investigatory procedures would have been utilized in the instant case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question. *See* LaCount and Girese, *The "Inevitable Discovery" Rule,* 40 Albany L Rev 483, 491 (1976); 3 LaFave, *supra,* at § 11.4.

> "Clearly, the two requisites of the doctrine are linked; however, the major thrust of each can be separated. When considering the actual police procedures the court is inquiring into whether or not alternative action would have been taken by the people involved. The second aspect deals with the probability of success of the alternative action and takes into account factors outside the control of the investigators." LaCount, *supra,* 40 Albany L Rev at 502.

The precision with which the probability of discovery must be

---

[16] *Brewer v. Williams,* 430 US 387, 97 S Ct 1232, 51 L Ed 2d 424 (1977).

shown will vary with the circumstances. When the evidence is well concealed or time is a critical factor, the state will have to make a more exact showing of how or when the discovery would have occurred. In the case of a warrantless entry into premises, the two-part test would require consideration of the possibility that, if police had not made the illegal entry into the premises, evidence might have been disposed of or hidden. *See* Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules,* 74 Colum L Rev 88, 97 (1974). The findings used to substantiate this two-part test must be fairly supported by the record.

3█ The trial court made extensive findings of fact on this issue by which we are bound, if there is evidence in the record to support them. *State v. Peller,* 287 Or 255, 598 P2d 684 (1979); *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). The trial court found that, even if the police officer had not entered defendant's residential hotel room when he did, within 48-56 hours the hotel maid would have lawfully entered the room to clean it, according to the hotel's custom and policy. The trial court found that the maid, as a private citizen, would be reasonably expected to report the finding of the body to police authorities, and the body of the victim would have come into the state's custody. The trial court found that the victim's body would have been discovered prior to any significant physical decomposition. The trial court found that the discovery of the body would have routinely led to a check of hotel records and to the discovery of defendant's identity as the renter of the room. Based on the evidence before it, the court found that defendant would not have tried to remove the body or dispose of it to conceal the crime. It found that the special expertise of homicide detectives, who would have been assigned to the case after discovery of the body, would have discovered all the evidence that was seized from defendant's room and admitted at trial.

These findings are fairly supported by the record. We conclude that the two tests for application of the inevitable discovery doctrine have been met by a preponderance of the evidence in this case, and that the exclusionary rule does not require suppression of the evidence seized from defendant's room on the ground that it was "poisoned fruit" derived from his statements obtained during custodial questioning which

violated his Fifth Amendment right to have counsel present.[17]

■ Defendant cites *Nix v. Williams, supra,* for the proposition that the inevitable discovery rule only applies when investigative procedures are already in progress prior to the illegal discovery. Defendant is correct that the Supreme Court concluded that the record in *Nix* supported a finding that the volunteer search party already under way would inevitably have discovered the victim's body, in essentially the same condition as it was when the accused led police to it. While situations justifying the application of the inevitable discovery doctrine may be more likely to be present when an investigation has already begun, we do not understand *Nix* to require that one actually be under way.

Both defendant and the state argue that ORS 133.683,[18] the Oregon codification of the inevitable discovery doctrine, applies to this case.[19] The text of ORS 133.683, however, although not a model of clarity, appears to apply only to purge the "taint" of evidence (poisoned fruit) derived from a prior unlawful search or seizure. For example, it does not appear to apply either to primary evidence seized in the course of an illegal search or to evidence which is the "fruit" of a Fifth and not a Fourth Amendment violation. Furthermore, the statutes of which ORS 133.683 forms a part regulate searches and seizures only. ORS 133.525 - 133.703. These statutes regulate the issuance and execution of search warrants, the disposition of things seized, and the suppression of evidence unlawfully obtained in violation of these provisions.

---

[17] Defendant also raised the issue of a bad faith limitation on the inevitable discovery doctrine. He raised this only in the context of a federal constitutional analysis; the issue has been decided contrary to defendant's position by the Supreme Court in *Nix v. Williams,* 467 US 431, 104 S Ct 2501, 81 L Ed 2d 377 (1984).

[18] ORS 133.683 provides:

"If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to suppression, and if as a result of such search or seizure other evidence is discovered subsequently and offered against a defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes by a preponderance of the evidence that such evidence would have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of ORS 133.525 to 133.703."

[19] Defendant argues that the last phrase in the text of ORS 133.683 contains an implicit requirement that a finding of police good faith be made. Because we do not find this statute applicable, we express no opinion about this contention.

ORS 133.683 refers specifically to these sections and is concerned only with evidence discovered as a result of exploiting a prior unlawful "search or seizure." We find no other statute addressing evidence derived from illegalities other than unlawful searches and seizures.

As discussed above, there are two police illegalities here which would independently warrant the suppression of the physical evidence seized from defendant's room: (1) the custodial interrogation of defendant after he asserted his right to counsel, and (2) the warrantless entry and search of defendant's residence. While the "fruit" of the first illegality was "untainted" by the inevitable discovery doctrine, the second illegality, the warrantless entry and search of defendant's premises, may yet require suppression of the evidence taken from defendant's room, unless it can be justified upon some other ground.

2. *Emergency Doctrine.*

The emergency doctrine is a carefully and narrowly drawn exception to the warrant requirement. When the premises is a dwelling, the state must make a strong showing that exceptional emergency circumstances truly existed. *Vale v. Louisiana,* 399 US 30, 34, 90 S Ct 1969, 26 L Ed 2d 409 (1970).

The state contends that the emergency or exigent circumstance in the instant case was the police officer's duty to render possible assistance to a victim of a confessed homicide. Defendant counters that there was absolutely no indication that the alleged victim was still alive. We agree with the state, however, that the police are not required to accept a lay person's determination of death. We conclude that the initial entry into defendant's room was lawful based upon the police officer's reasonable belief, in the circumstances, that he might be able to render lifesaving medical assistance to the victim. After the officer entered the room and found the victim dead, however, the emergency situation ceased.

There are actually two issues here: (1) the warrantless entry, and (2) the warrantless search and seizure of physical evidence from defendant's room. After lawful entry based on an emergency situation, the officers are limited to searching and seizing items that are in plain view. *Mincey v.*

*Arizona,* 437 US 385, 98 S Ct 2408, 57 L Ed 2d 290 (1978). This would not justify, for example, a search into closed cupboards or drawers. In *Mincey,* the Supreme Court said:

> "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. * * * 'The need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent exigency or emergency.' * * * And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." 437 US at 392. (Citations and footnotes omitted.)

It is not clear from the record what, if any, evidence that was not in plain view was seized after the initial police entry. Based on the record before us, we conclude that the physical evidence, including the evidence relating to the discovery of the victim's body, seized as a result of the police officer's initial entry into defendant's room, was properly admitted at trial.

The decision of the Court of Appeals is affirmed.