No. 12 January 7, 2026 467

***This is a nonprecedential memorandum opinion pursuant to ORAP 10.30 and may not be cited except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAMES PAUL CABLE,
*Defendant-Appellant.*

Lane County Circuit Court
21CR56718; A182118

Clara L. Rigmaiden, Judge.

Submitted November 13, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Anne K. Munsey, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Christopher A. Perdue, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

Defendant appeals a judgment of conviction for second-degree murder, ORS 163.115, and assaulting a public safety officer, ORS 163.208. He raises four assignments of error, all relating to suppression of evidence regarding the murder. We review for legal error, relying on the trial court's express and implied factual findings from the suppression hearing. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). We state the facts in accordance with the standard of review and, for the reasons explained below, affirm the convictions.

*Facts.* Late one night, in response to a phone call from defendant, Owen went to defendant's home and saw a man lying on the kitchen floor, mostly covered by a blanket. There was what looked like blood in the kitchen. Defendant told Owen that he had killed his roommate in self-defense when the roommate came at him with a knife. Defendant "didn't seem like he was in his right mind." Owen did not check and did not know whether the man on the floor was dead. Owen left and called 9-1-1. Shortly thereafter, around 1:00 a.m., Officer Stropko met with Owen. In addition to giving a statement, Owen expressed concern for CB, a second roommate who still lived at the home as far as Owen knew and whom Owen had been unable to reach by phone.

At the same time, around 1:00 a.m., a group of officers led by Sergeant Williams arrived at defendant's home. While they were still outside, Stropko called Williams and told him that there was an urgent need to enter the home to determine the welfare of the occupants, as Owen appeared to be making a credible report of a possible homicide. It had been about an hour since Owen had been in the home. Stropko believed that there was a "good chance" that the person Owen had seen on the floor was dead, but he did not know if he was dead, and, in his experience, when people call to report that someone looks lifeless and may be dead, "more often than not, they're not dead" and they need medical assistance. Williams similarly had the experience of people being reported dead who were not actually dead and needed medical assistance.

Williams noticed the front door was ajar. He called out and received no answer. Upon entering through the front door, the officers saw someone dart through the hallway, followed him, and found defendant in a back bedroom trying to leave through a sliding glass door. He had visible blood on his person and his clothing. The officers detained defendant and went to look for anyone else in the home. Williams found a man on the kitchen floor under a blanket and immediately called for paramedics. Upon closer examination, however, he saw that the man—later determined to be defendant's roommate, DP—had head injuries that no one could survive and cancelled the call. The officers did not find anyone else in need of assistance, so they vacated the home and secured it from outside until a search warrant could be obtained.

Meanwhile, defendant was brought to the police station and placed in a holding cell. Detective Sites was briefed on what Owen had said and what Williams saw at defendant's home. Sites met with defendant, who made irrational statements. Sites could see obvious bloodstains on the front of defendant's jeans, including smears and spatter. Defendant had some scratches and a cut on his hand, but the quantity and pattern of blood on the jeans was consistent with a violent event and looked to be from an impact, not a scratch or cut. By that time, Sites believed that he had probable cause to arrest defendant for second-degree murder. Sites wanted to preserve the visible blood evidence, so he instructed defendant to remove his jeans, provided a change of clothes, and took the jeans. The blood was later tested and confirmed to be DP's.

Defendant was charged with second-degree murder for the death of DP and with assaulting a public safety officer. Before trial, he unsuccessfully moved to suppress some of the evidence against him. Defendant waived his jury right, and the charges were tried to the court, which found him guilty on both counts.

*Warrantless Entry.* In his first two assignments of error, defendant contends that the trial court erred in denying his motion to suppress evidence from the warrantless entry into his home and in denying a related motion to

controvert a search warrant affidavit containing information from the warrantless entry.

Article I, section 9, of the Oregon Constitution prohibits unreasonable searches and seizures. Warrantless entry into a person's home is *per se* unreasonable unless "'one of the few specifically established and carefully delineated exceptions to the warrant requirement'" applies. *State v. Sullivan*, 265 Or App 62, 67, 333 P3d 1201 (2014) (quoting *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988)). It is the state's burden to prove that an exception applies. ORS 133.693(4). In this case, the state successfully argued the emergency aid exception. That exception applies "when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm." *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011) (footnotes omitted). Objective reasonableness depends on the totality of the circumstances. *State v. Clay*, 293 Or App 797, 803, 429 P3d 1038, *rev den*, 364 Or 209 (2018).

Defendant argues that it was not objectively reasonable for the police to believe that anyone in defendant's home needed emergency aid or assistance. In his view, based on the information that the police had, defendant was not seriously injured, the person on the kitchen floor was "likely dead," and there was no reason to believe that CB was even present in the home.

We conclude that the trial court did not err in applying the emergency aid exception. On this record, the police reasonably believed that DP could still be alive and in need of immediate medical assistance. The possibility that he was already dead did not make it objectively unreasonable to enter to try to provide aid. Put another way, the police were not required to assume that DP was already dead and thus leave him to die if that assumption was wrong. *See State v. Miller*, 300 Or 203, 229, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986) (as relevant to the emergency-aid exception, "the police are not required to accept a lay person's determination of death," as the officer "might be able to

render lifesaving medical assistance to the victim"). Because it was objectively reasonable to enter the home to provide aid to DP, the emergency-aid exception applies, regardless of whether it was also objectively reasonable to enter to provide aid to defendant or CB. We affirm the denial of the motion to suppress evidence from the warrantless entry into defendant's home and, by extension, the denial of the motion to controvert.

*Defendant's Jeans.* In his third assignment of error, defendant challenges the denial of his motion to suppress the jeans evidence. The trial court ruled that the warrantless seizure of defendant's jeans was justified by both the search-incident-to-arrest exception and the plain-view doctrine. We affirm based on the plain-view doctrine.

"Under the plain-view doctrine, an officer may seize an item if the officer can do so from a position where that officer is entitled to be and the incriminating character of the item to be seized is immediately apparent." *State v. Currin*, 258 Or App 715, 718-19, 311 P3d 903 (2013) (internal quotation marks omitted). Even "normally benign objects" are seizable under the plain-view doctrine if the officer who sees them has probable cause to believe that they are evidence of a crime. *State v. Wise-Welsh*, 318 Or App 146, 147-48, 506 P3d 454, *rev den*, 370 Or 198 (2022). Here, the trial court found that Sites saw defendant's bloody jeans "from a lawful vantage point" and concluded that Sites had probable cause to believe that they were evidence of a crime.

Defendant argues that the bloody jeans were not "obvious evidence of a crime," because it was not necessarily DP's blood, and so the plain-view doctrine does not apply. *See State v. Sagner*, 12 Or App 459, 473, 506 P2d 510 (1973) (assessing whether the items found in plain view "were obvious evidence of crime"; "[t]hat is, assuming that the items were legitimately encountered, was it evident that they were stolen goods?"). We disagree. Based on what he knew, Sites had probable cause to believe that the blood on the jeans belonged to the man on the kitchen floor and was evidence of a crime. Absolute certainty was not required, only probable cause. The trial court correctly denied the motion to suppress based on the plain-view doctrine, so we need not

address search incident to arrest, which was an alternative ground for denial.

*Blood Testing Results.* After seizing defendant's jeans, the state sent the blood for testing, and it was confirmed to be DP's. The state concedes that it needed a warrant for that testing and that it was therefore error to deny suppression of the blood-testing evidence. The state argues that the error was harmless, however, and therefore is not a basis for reversal. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (an error is harmless if there is little likelihood that it affected the verdict, in which case it cannot be the basis for reversal of a criminal conviction). Defendant disagrees.

Having reviewed the trial record, we conclude that the error was harmless. Defendant admitted to causing DP's death, both in opening statement and in his trial testimony, but claimed not to remember the actual event. His defense theory was that he was high on ketamine and nitrous oxide and extremely sleep deprived and therefore lacked the requisite culpable mental state for second-degree murder. Given that it was undisputed that defendant killed DP, and given the extensive circumstantial evidence that the blood on the jeans was DP's, the blood-testing evidence was of minimal value to the state's case, even taking into account that it was direct evidence of the source of the blood. There is little likelihood that the error in admitting the test results affected the court's verdict.

Affirmed.